SOUTHERN PACIFIC COMPANY and Union Pacific Railroad Company, Plaintiffs,

v.

The UNITED STATES of America and the Interstate Commerce Commission, Defendants.

Civ. No. 02577.

United States District Court
D. Nebraska.

Dec. 6, 1967.

Raymond E. McGrath, Omaha, Neb., Alan C. Furth and Robert L. Pierce, San Francisco, Cal., for plaintiff Southern Pacific.

G. Clark Cummings, New York City, William P. Higgins, Omaha, Neb., for plaintiff Union Pacific.

David F. Turner, John H. D. Wigger, Larry Meyer, Dept. of Justice, Washington, D. C., Theodore L. Richling, U. S. Atty., Omaha, Neb., for defendant the United States.

Robert W. Ginnane, Fritz Kahn, Betty Jo Christian, Washington, D. C., for defendant Interstate Commerce Commission.

Dennis McCarthy, Salt Lake City, Utah, Ernest Porter, Denver, Colo., Donald R. Ross, Omaha, Neb., for defendant intervener Denver & Rio Grande.

E. Barrett Prettyman, Washington, D. C., Yale C. Holland, Omaha, Neb., for defendant intervener Western Pacific.

Before LAY, Circuit Judge, and ROBINSON and VAN PELT, District Judges.

LAY, Circuit Judge.

Plaintiffs, Southern Pacific and Union Pacific seek equitable relief to enjoin the Interstate Commerce Commission

from enforcement of a supplemental order, dated January 6, 1966, modifying the Commission's order of February 6, 1923, entitled Control of Central Pacific by Southern Pacific, Finance Docket No. 2613.

While the one general issue before us is the legality of the preferential routing and solicitation by the Southern Pacific Company and the Union Pacific Railroad,[1] plaintiffs argue their case within the frame work of two basic questions. First, they challenge the propriety of modifying a condition originally imposed by the Interstate Commerce Commission upon the Southern Pacific when it acquired the Central Pacific Railway in 1923 (the Control case, 76 I.C.C. 508 (1923)). The second question concerns the legality of a 1924 agreement and the practices thereunder, providing for reciprocal solicitation and routing by Union Pacific and Southern Pacific in each other's behalf.

By its 1923 order the Commission approved and authorized, subject to nine conditions, the acquisition by the Southern Pacific of control of the Central Pacific Railway Company through lease and stock ownership. The fifth condition, hereinafter referred to as condition (e), read as follows:

*"That the Southern Pacific Company shall cooperate with the Union Pacific Railroad Company to secure by active solicitation the routing of the maximum of freight traffic via the lines of the Union Pacific Railroad Company and the Central Pacific Railway Company through the Missouri River and Ogden, Utah, as parts of one connected continuous line,* between all points in California and Oregon north of and including Caliente and Santa Margarita, Calif., and south of and including the Klamath Falls branch and Kirk, Ore., on the one hand, and points north and west of a line along the northern boundaries of Oklahoma and Arkansas, to the Mississippi River, thence along the Mississippi and Ohio Rivers (but not including intermediate cities on the Ohio River) to Wheeling, W. Va., and thence on a line drawn just east of Pittsburgh, Pa., and Buffalo, N. Y., to Niagara Falls, N. Y."* (Emphasis ours.)

At the time, the Denver and Rio Grande Western Railroad (hereinafter the Rio Grande) acquiesced in the 1923 condition. However, in 1957, the Rio Grande sought to reopen the control proceedings for modification of condition (e). In 1962, the Commission in a 6–5 decision refused to modify the original condition so as to eliminate all reference to the Union Pacific. The Rio Grande then sought relief from the District Court in Colorado. The Commission's order was set aside by the District Court and the proceeding remanded for the Commission to consider additional evidence. Denver & R.G.W. R.R. v. I.C.C., D.C., 229 F.Supp. 249 (1964). Upon reconsideration, the Commission revised its prior holding and modified the condition omitting the Union Pacific's name as originally recommended by the Exam-

---

1. This same case was heard by the District Court in Colorado in 1963, but was remanded to the Commission for consideration of additional evidence. The District Court in discussing the issues, observed:

"This preferential solicitation was attacked as being improper or illegal under several sections of the Act as well as the antitrust law. The origin and the authority for these practices were contained in both condition (e) and the 1924 agreement. These two items con- stituted the physical evidence of the authority for the practice, but *it was the practice, or the authority for the practice,* which was attacked by the plaintiff, and where this *authority might be physically found would seem to be of minor importance.* Thus in effect there was but one general issue before the Examiner and before the Commission, although in somewhat different context." (Emphasis ours). Denver & R. G. W. R.R. v. I.C.C., D.C., 229 F.Supp. 249, 253, 254 (1964).

iner.[2] The Commission likewise held the 1924 agreement and practices of the Southern Pacific and the Union Pacific contrary to the National Transportation Policy (49 U.S.C. prior to § 1), and their preferential routing in violation of Section 3(4) of the Interstate Commerce Act, 49 U.S.C. § 3(4).

We sustain the action of the Commission and deny the injunctive relief requested.

It is helpful to understand the routes of the various carriers as demonstrated on the attached map, Appendix A. The Union Pacific operates the route east of Ogden via Cheyenne to Omaha, and also makes interchanges at Denver with the Rio Grande, via routes through northeastern Colorado and central Kansas east to Omaha and Kansas City. The southern route of the Southern Pacific is a transcontinental route from the west coast to Kansas City via El Paso. The Central Pacific, now the Southern Pacific, by complete merger in 1959 (Southern Pac. Co. Merger, 307 I.C.C. 806) connects at the Utah Gateway with both the Rio Grande and the Union Pacific and goes west to California.

Western Pacific, an intervening defendant,[3] competes with the Southern Pacific both on its north-south route through California and Oregon *and its east-west route from San Franciso to Ogden*. Western Pacific connects at Salt Lake City with both the Rio Grande and the Union Pacific. The Rio Grande operates two main lines between Denver and Ogden. One is via Pueblo, the other is through the Moffat Tunnel and the Dotsero cutoff. West of Dotsero the lines are identical to Ogden. The Dotsero cutoff and the Moffat Tunnel were opened in 1934, thereby reducing the distance between Denver and Ogden by 175 miles.

The Commission observed:

"The differences in distance, whether in favor of the Southern Pacific-Rio Grande routes or the Southern Pacific-Union Pacific routes, are insignificant from the standpoint of length of hauls [and 'maintenance of schedules'], and therefore the two routes are substantially comparable. * * * " 317 I.C.C. 469, 475–76 (1962).

Under condition (e) and the 1924 agreement between Southern Pacific and Union Pacific, the plaintiffs have been routing and soliciting in favor of each other's lines at the Utah Gateway, in preference to any other interchanging lines.

Plaintiffs now urge that the Commission has no power to reopen the 1923 Control proceeding or to modify condition (e). We disagree. As the Commission said in its 1966 order:

"[F]uture changes of circumstances were undoubtedly one of the reasons which prompted inclusion of condition (i) reserving jurisdiction to reopen

---

2. The modified condition reads:
   "*That the Southern Pacific Company shall continue to secure by active solicitation the routing of the maximum of freight traffic through the Missouri River and Ogden, Utah,* between all points in California and Oregon, north of and including Caliente and Santa Margarita, Calif., and south of and including the Klamath Falls branch and Kirk, Oreg., on the one hand, and points north and west of a line along the northern boundaries of Oklahoma and Arkansas, to the Mississippi River, thence along the Mississippi and Ohio Rivers (but not including intermediate cities on the Ohio River) to Wheeling, W. Va., and thence on a line drawn just east of Pittsburgh, Pa., and Buffalo, N.Y., to Niagara Falls, N.Y.;" (Emphasis ours.)

3. Western Pacific observes in its brief, p. 10, n. 7:
   "In January 1966, Western Pacific filed with the Commission a complaint against Union Pacific and Southern Pacific, alleging that the Agreement of 1924, the Memorandum of 1947, and the preferential practices implemented thereunder violate Section 1 of the Sherman Act, the National Transportation Policy, and Sections 3(4), 5(1) of the Interstate Commerce Act. By stipulation of the parties, a hearing on that complaint is being stayed pending the ultimate disposition of the instant case."

for supplemental orders as appropriate in the light of future events." [4]

■■ The Commission "has the power to retain jurisdiction for the purpose of making modifications that it finds necessary in the light of subsequent circumstances * * *." Baltimore & O. R.R. v. United States, 386 U.S. 372, 387, 87 S.Ct. 1100, 1108, 18 L.Ed.2d 159 (1967). See also 49 U.S.C. § 5(9). Any rule to the contrary could illogically bind our national transportation system to archaic philosophies beneficial only for conditions of the past, but detrimental to the public welfare today.

We turn to the substantive problems involved. A brief background is necessary. In 1862 and 1864 the Pacific Railroad Acts [5] were passed by Congress. These Acts authorized the building of the first transcontinental railroad in this country which found completion in the historic joinder at Promontory, Utah, of the two roads, the Union Pacific and the Central Pacific, on May 10, 1869.

Thereafter, in 1887, the Interstate Commerce Act was passed, and at that time, as recently observed, the railroads, then "had a practical monopoly of freight transportation * * * and discriminations flourished." American Trucking Assoc., Inc. v. Atchison, T. & S.F. Ry., 387 U.S. 397, 406, 87 S.Ct. 1608, 1613, 18 L.Ed.2d 847 (1967). As other roads began to develop in this country, railroads began to view the competitive future. In 1912 the Supreme Court was confronted with the control of the Southern Pacific by the Union Pacific. This was disapproved in United States v. Union Pac. R.R., 226 U.S. 61, 33 S.Ct. 53, 57 L.Ed. 124 (1912), as being a restraint of trade violative of the Sherman Antitrust Act of 1890.

Thereafter, because of the interlocking financial and physical relationships between Central Pacific and Southern Pacific's California lines, the Southern Pacific was forced to defend a lease and stock acquisition of the Central Pacific. This was similarly denied, with the Supreme Court making this relevant observation:

"The proof is ample that the policy of the Southern Pacific system has been to favor transportation on its line by securing for itself, whenever practicable, the carriage of freight which would normally move eastward or westward over the shorter line of the Central Pacific Railroad and its connections [the central route], for its own much longer and wholly owned southern route. This course was limited by an arbitrary rule during the time the Union Pacific dominated the Southern Pacific from the stock purchase [of Southern Pacific's stock by Union Pacific] in 1901 until the so-called 'unmerger' in 1913, as the result of the decision of this court in the Union Pacific Case [United States v. Union Pac. R.R., 226 U.S. 61[, 33 S.Ct. 53, 57 L.Ed. 124]]. The compelling motive of this course of conduct is obvious. The Southern Pacific owns and controls the southerly route, and receives 100 per cent. of the compensation for freight transported by its road and water lines. Over the Central Pacific route it receives but a fraction of the freight, because the Union Pacific with its Eastern connections take up the carrying from Ogden to the East. Self-interest dictates the solicitation and procurement of freight for the longer haul by the Southern Pacific lines." United States v. Southern Pac. Co., 259 U.S. 214, 231, 42 S.Ct. 496, 499, 66 L.Ed. 907 (1922).

In 1920 the first Transportation Act was passed. 41 Stat. 456 (1920). It rec-

---

4. Condition (i), also part of the 1923 I.C.C. order, provides:
   "That this proceeding may be reopened at any time by order of the Commission either upon the initiative of the Commission or, in the discretion of the Commission, upon the motion of any person claiming an interest in the matter, for the purpose of making such orders as the Commission may deem necessary or appropriate supplementary to the present order."

5. Act of July 1, 1862, ch. 120, 12 Stat. 495; Act of July 2, 1864, ch. 216, 13 Stat. 362 (codified in 45 U.S.C. § 83).

ognized that the "public welfare" would be better served by a national transportation system. Subject to the Interstate Commerce Commission's approval and direction, common carriers could otherwise merge or join together notwithstanding the prohibtion of antitrust or other laws.[6]

Immediately thereafter, the Southern Pacific sought authorization from the Commission to acquire control of Central Pacific under the Act, 41 Stat. 480–482, as amended, 49 U.S.C. § 5(2) (1964). This was opposed by the Union Pacific. After a long hearing the Union Pacific and others withdrew their objection [7] and the Commission attached to its approval of the merger nine specified conditions. Condition (e), supra reflected similar concern of the Commission over Southern Pacific's favoring its longer route to the jeopardy of the transcontinental route of Central Pacific and Union Pacific. The newly approved merger and conditions [8] were embodied in the decree of the District Court. United States v. Southern Pac. Co., 290 F. 443 (D.Utah 1923). No appeal was taken from the order of the Commission or court.

## THE PACIFIC RAILROAD ACTS

In the present proceeding the Union Pacific and the Southern Pacific urge that condition (e) is not only lawful but accords with a mandate of the Pacific Railroad Acts. They argue that all conditions attached to the 1923 order by the Commission were nothing more than the fulfillment of the Acts.

Subsequent to the Commission's approval of the acquisition of Central Pacific by the Southern Pacific, an agreement was entered into with the Union Pacific which was theoretically premised upon condition (e). The 1924 agreement (1) obligated Union Pacific and Central Pacific to preferentially solicit for each other, (2) obligated Union Pacific and Central Pacific to preferentially route freight unrouted by the shipper along the Union Pacific and Central Pacific line and (3) expanded the territory of the preferential solicitation and routing beyond condition (e). The failure of the Commission in the 1962 proceeding to consider this agreement and practices thereunder motivated the District Court to remand the case to avoid "splintered issues," under authority of A. L. Mechling Barge Lines, Inc. v. United States, 376 U.S. 375, 84 S.Ct. 874, 11 L.Ed.2d 788 (1964).

Plaintiffs similarly defend the 1924 agreement and the practices under the Pacific Railroad Acts, arguing that, like the conditions in the Interstate Commerce Commission order, they too simply embody the statutory benefits accorded them by the Acts, and therefore cannot be countermanded by order of the Commission.[9]

6. The Interstate Commerce Act was further amended by the Transportation Act of 1940, 54 Stat. 899.

7. In the recent order of the Commission denying control of the Western Pacific by either the Southern Pacific or the Santa Fe, the Commission observed:
   "We have considered the possibility of authorizing one or the other of the applicants herein to acquire control of Western Pacific subject to a solicitation condition to safeguard the central route of Western Pacific similar to the condition imposed in the Central Pacific case. However, the situation here does not contain the element of intermingled properties and operations necessitating the control authorization in the Central Pacific case, *and, moreover, Santa Fe has recorded its ob-*

*jection* to any condition which would require solicitation from its own territories for Western Pacific, either to the West or East of the Utah gateways." Southern Pacific Co.—Control —Western Pacific R.R., 327 I.C.C. 387, 400 (1965). (Emphasis ours.)

8. The other relevant conditions generally required the Southern Pacific to cooperate or join the Union Pacific in maintaining service, schedules and rates via the Ogden Gateway and the line of the Central Pacific.

9. Plaintiffs urge that in 1923 it was the mutual understanding of the parties, including the Rio Grande, that condition (e) was in furtherance of the Pacific Railroad Acts and therefore should not be set aside. Apropos here is Mr. Jus-

In 1962, in their first supplemental order, the Commission interpreted the Pacific Railroad Acts in accord with plaintiffs' contention. 317 I.C.C. 469 (1962). Upon reconsideration in its 1966 order, the Commission reversed itself. We feel the 1966 order and its interpretation is in accord with the correct construction of the Pacific Railroad Acts. These Acts provide in part as follows:

"The track upon the entire line of railroad and branches shall be of uniform width, to be determined by the President of the United States, so that, when completed, cars can be run from the Missouri River to the Pacific coast; * * * the whole line of said railroad and branches and telegraph shall be operated and used for all purposes of communication, travel, and transportation, so far as the public and government are concerned, as one connected, continuous line; * * *" Act of July 1, 1862, ch. 120, § 12, 12 Stat. 495.

"* * * the several companies authorized to construct the aforesaid roads are hereby required to operate and use said roads and telegraph for all purposes of communication, travel, and transportation, so far as the public and the government are concerned, as one continuous line; and, in such operation and use, to afford and secure to each equal advantages and facilities as to rates, time and transportation, without any discrimination of any kind in favor of the road or business of any or either of said companies, or adverse to the road or business of any or either of the others * * *." Act of July 2, 1864, ch. 216, § 15, 13 Stat. 362 (codified in 45 U.S.C. § 83).

This language was interpreted by the Supreme Court in United States v. Union Pac. R.R., 226 U.S. 61, 33 S.Ct. 53, 57 L.Ed. 124 (1912). Mr. Justice Day stated:

"These acts, it is said, are only intended to secure the permanent physical connection of the roads, and to provide for equal accomodations upon the basis of independent carriage, and outline no method by which the two roads can be compelled to make a joint through rate, and that at the time of the stock transfer there was no such provision in the interstate commerce acts. Therefore, it is said that the Union Pacific, no less than the Rio Grande, would have been practically at the mercy of the Southern Pacific in the favorable or unfavorable treatment which might have been accorded to it in the matter of through business to be transported eastwardly. The purpose of Congress to secure one permanent road to the coast so far as physical continuity is concerned is apparent, but we do not think the acts stop with that requirement. It is provided that facilities as to rates, time and transportation shall be without any discrimination of any kind in favor of either of said companies, or adverse to the road or business of any or either of the others; and the purpose of Congress to secure a continuous line of road, operating from the Missouri river to the Pacific coast as one road, is further emphasized in the act of Congress of June 20, 1874, [c. 331, 18 Stat. 111,] making it an offense for any officer or agent of the companies authorized to construct the roads, or engaged in the operation thereof, to refuse to operate and use the same for all purposes of communication, travel and transportation, so far as the public and government are concerned, as one continuous line, and making it a misdemeanor to refuse, in such operation and use, to afford and secure to each of said roads equal advantages and facilities as to rates, time and transportation, without any discrimination of any kind in favor of or adverse to any or either of said companies." 226 U.S. at 91-92, 33 S.Ct. at 59.

tice Brennan's statement that "the ICC is not prisoner of the parties' submissions." See Baltimore & O. R.R. v.

United States, 386 U.S. 372, 430, 87 S.Ct. 1100, 1129, 18 L.Ed.2d 159 (1967) (concurring opinion).

Plaintiffs construe the above language of the Court to mean that the Union Pacific and Central Pacific must *prefer* one another to the prejudice of a connecting line, but that no other carrier may discriminate against either of them. This contradicts not only the spirit of the acts, but the plain language as well.

Mr. Justice Day added:

"Such practices of *systematic* and *preconcerted discrimination* as are said to have destroyed the Rio Grande's carrying trade as a connection for the East for business at Ogden would have violated the statute as discriminations adverse to the Union Pacific, and be equally violative of the letter and spirit of the acts of Congress. Certainly such discriminations could be restrained by the courts (Union Pacific Railway Co. v. Chicago, Rock Island & Pacific Railway Co., 163 U.S. 564, 603, 604 [16 S.Ct. 1173, 41 L.Ed. 265]), and might possibly have resulted in a forfeiture of all rights under the acts of Congress." (Emphasis ours.) 226 U.S. at 92, 33 S.Ct. at 59.

Section 15 of the Act prohibits "discrimination of any kind *in favor of* [10] the road or business of any or either of said companies, *or adverse* to the road or business of any or either *of the others* * * *."
(Emphasis ours.)

The case of Union Pac. Ry. v. Chicago, R.I. & P. Ry., 163 U.S. 564, 16 S.Ct. 1173, 41 L.Ed. 265 (1896), as cited by Mr. Justice Day, is contrary to plaintiffs' position. Under the authority of the Pacific Railroad Acts, the Supreme Court enjoined the *Union Pacific* from discriminatory practices to other connecting lines. The Union Pacific reasoned it would fail in its public duty by fulfilling a trackage and bridge agreement with connecting roads across the Missouri River. The Court enforced the contracts between the carriers and said:

"For the provisions of the Pacific Railroad acts relating to the bridge over the Missouri river, its construction and operation, imposed on the Pacific Company the duty of permitting the Rock Island Company to run its engines, cars and trains over the bridge and the tracks between Council Bluffs and Omaha * * *." 163 U.S. at 586, 16 S.Ct. at 1181.

"It is impossible for us to ignore the great policy in favor of continuous *lines* thus declared by congress, and that it is in *effectuation of that policy* that such business arrangements as will make such connections effective are made." (Emphasis ours.) 163 U.S. at 589, 16 S.Ct. at 1183.

The original Section 15 of the Act of 1862, and its amendatory provisions, are clear indication that the vision of Congress was not confined to the Union Pacific and the Central Pacific or just their branch lines, nor were their privileges to be forever exclusive:

"* * * *any other railroad company now incorporated, or hereafter to be incorporated, shall have the right to connect their road with the road and branches* provided for by this act, at such places and upon such just and equitable terms as the President of the United States may prescribe. Wherever the word company is used in this act it shall be construed to embrace the words their associates, successors, and assigns, the same as if the words had

10. The Union Pacific openly acknowledges this construction in a footnote on page 67 of Union Pacific's brief, when it argues:

"The 1864 Pacific Railroad Act prohibits 'any discrimination of any kind *in favor of* the road or business of any or either of said companies and adverse to the road or business of any or either of the others.' (emphasis added) Yet to compel Southern Pacific only to solicit the Central Pacific portion of the Central Pacific-Union Pacific route is discrimination *in favor of* the Central Pacific portion. This is quite apart from the fact that Southern Pacific solicitation via Rio Grande is discrimination against Union Pacific."

been properly added thereto." [11] (Emphasis ours.)

Mr. Justice Strong said in review of the Pacific Railroad Acts in Union Pac. R. R. v. Hall, 91 U.S. 343, 345–346, 23 L.Ed. 428 (1875):

"The scheme of the act of Congress, then, is very apparent. *It was to secure the connection of the main line, by at least three branches, with the Missouri and Iowa Railroads, and with a railroad running eastwardly from Sioux City in Iowa,* either through that State or through Minnesota. An observance of this scheme, we think will aid in considering the inquiry at what place the act of Congress, and the orders of the President made in pursuance thereof, established the eastern terminus of the Iowa branch. From it may reasonably be inferred that the purpose of Congress was *to provide for connections of the branches of the main line of the Union Pacific road with railroads running through the States on the east of the Territory,* and to provide *for those connections within those States, at points at or near their western boundaries.*" (Emphasis ours.)

The purpose of Congress by the passage of the Pacific Railroad Acts was to create a strong link between the East and the West, sufficient to ensure military protection for the isolated areas if needed, as well as a dependable and speedy means of commercial and social access. But it is clear that Congress envisioned not only a single, unbroken cross-nation line, but a network of railroads feeding and complementing the transcontinental route.[12]

11. This section is now codified as 45 U. S.C. § 82. Congress recognized that the Act might be further amended when it said:

> "*And be it further enacted,* That congress may, at any time, alter, amend, or repeal this act." 13 Stat. 356 § 22.

And as observed in Union Pac. Ry. v. Chicago, R.I. & P. Ry. supra, 163 U.S. at 589, 16 S.Ct. at 1183:

> "On June 15, 1866, an act was approved, [c. 124, 14 Stat. 66,] 'to facilitate commercial, postal and military communication among the several states,' carried forward as section 5258 of the Revised Statutes, which provided that '*every railroad company in the United States,* whose road is operated by steam, its successors and assigns, be, and is hereby, authorized to carry upon and over its road, boats, bridges and ferries, all passengers, troops, government supplies, mails, freights and property on their way from any state to another state, and to receive compensation therefor, and to connect with roads of other states *so as to form continuous lines* for the transportation of the same to the place of destination.'" (Emphasis ours.)

12. Despite numerous attempts during the Congressional debates to cut off the proposed branch lines, the majority consistently voted to retain them for such reasons as Senator Wade of Ohio expressed in his speech of June 19, 1862:

> "I believe the branches are as essential as the main trunk; that they will assist in building it; that they will furnish a motive for the embarking of money in the main line. It will be a mighty lonesome business to commence the main line in a mere wilderness, where it has nothing to attach itself to. You have got to begin it where it will seem to the world of no use whatever. Why, sir, it is like building a bridge across a magnificent river and never framing your abutments, by which you can get on to it. I do not think it is best that this should be done." Cong. Globe, 37th Cong., 2d Sess. 2807 (1862).

In Section 9 of the 1862 Act, the Leavenworth, Pawnee, and Western Railroad Company of Kansas was granted authority to build a line from a point on the Missouri River in Kansas to the Union Pacific line to the north, "*upon the same terms and conditions in all respects* as are provided in this act for the construction of the railroad and telegraph line first mentioned * * *." (Emphasis ours.) In Section 13, the Hannibal and St. Joseph Railroad Company of Missouri was specifically authorized to connect itself to the new transcontinental route. In the amendatory act passed in 1864, which is to be construed together with the 1862 Act (14 Opinions of Atty. Gen. 233 (1873)), Congress further authorized the Kansas railroad companies to make connection with the proposed Union Pacific line where practicable or desirable; in addition, if the Union Pacific company by the time of such con-

Plaintiffs insist that to afford *equal* solicitation to the Rio Grande at Ogden would constitute discrimination against the Union Pacific under the Pacific Railroad Acts. We cannot agree. Preferences and discrimination are among the prohibitions of the Acts and are in no sense sanctioned by them.[13]

■ We conclude that plaintiffs' reliance on the Pacific Railroad Acts is unavailing.

## MODIFICATION OF CONDITION (e) UNDER § 5(2) (a).

Plaintiffs argue alternatively that the Commission did not have sufficient grounds to find that condition (e) was no longer "just and reasonable" under Section 5(2) (a) of the Interstate Commerce Act.

The Commission considered evidence which clearly demonstrated the change since 1923 in the circumstances of Rio Grande as a competing line using the Ogden Gateway. The Commission points out that the "primary objective" of the conditions in the 1923 Control proceeding, wherein stock acquisition by Southern Pacific of Central Pacific was approved, was "the protection of the competitive position of the transcontinental route of the Central Pacific via Ogden against the Southern Pacific's possible preference for its long-haul southern route via El Paso." 328 I.C.C. 345, 354 (1966). The Commission states:

"The Rio Grande in no way seeks to disturb such a method of operation. But the Rio Grande now also maintains through routes and joint rates with the Southern Pacific at Ogden, and by means of its several eastern connections also operates as one connected, continuous central or Overland transcontinental line through Ogden and the Missouri River to points beyond, and we now see no valid reason for a continuance of a requirement by this Commission under which Rio Grande is precluded from *equality of treatment* by the Southern Pacific so far as traffic solicitation is concerned. The Rio Grande does not seek to have the Southern Pacific prefer it at the Ogden interchange to the prejudice of the Union Pacific or any other railroad. It only seeks an equal competitive position.

\* \* \* \* \* \*

"Had the petitioner's competitive situation at Ogden been more than that of a minor connecting line in 1923, we have no doubt that the requirements of condition (e) would have been different from those actually imposed in the *Control* case.

"After consideration of the full record, without the procedural limitations before imposed, we now find that the present effect of the discriminatory practices against the Rio Grande in the preferential solicitation and routing of traffic results *in a stifling of competition* between the Union Pacific and the Rio Grande on Transcontinental traffic. *It tends to relegate the Rio Grande to a secondary status as a transcontinental carrier.* The concern of Congress in 1862 and 1864 that there be a strong transcontinental rail

---

nection was not "proceeding in good faith to build the said railroad through the territories," the Kansas company was authorized to take over the project and build to the junction with the Central Pacific. Sections 9, 12. *In Section 18, the Burlington and Missouri Railroad Company was given specific authority to join its line to the Union Pacific.* For discussion of the decision to include branches and connecting lines within the scope of the Acts, see Russell, Improvement of Communication with the Pacific Coast as an Issue in American Politics 1783–1864 at pp. 296–320 (1948). See

also Trottman, History of the Union Pacific 10–22 (1923).

13. As the district court stated in United States v. Southern Pac. Co., 239 F. 998, 1006–1007 (D. Utah 1917), rev'd on other grounds, 259 U.S. 214, 42 S.Ct. 496, 66 L.Ed. 907 (1922):

"Those statutes require physical connection with the Union Pacific to make a through line and the furnishing of *equal advantages* and facilities as to rates, time and transportation *without discrimination of any kind.*" (Emphasis ours.)

line operated as one connected, continuous line, is not thwarted by the existence of several such transcontinental lines operating today.

"Upon reconsideration, we now find that in view of changed circumstances and developments since its imposition, condition (e) is no longer just and reasonable. Under present day circumstances it is contrary to the public interest and the national transportation policy. The Congressional desire reflected in the Pacific Railroad Acts has been fulfilled by the existence of several central transcontinental routes. The Rio Grande is an important segment of one of these routes. *The national defense and the public welfare of the country will not now be served by favoring one of these central transcontinental routes at the expense of another* under present day circumstances." (Emphasis ours.)

Plaintiffs place much significance upon the Commission's original denial of modification in 1962 and subsequent reversal in 1966 after remand "without additional facts before it." However, it is apparent to us, at least, that in 1962 the Commission was guided more by an erroneous interpretation of the Pacific Railroad Acts than it was by considerations of "public interest." Furthermore, at the time of the remand from the district court, nothing had been finally decided. Cf. United States v. United States Smelting, Refining & Min. Co., 339 U.S. 186, 198, 70 S.Ct. 537, 94 L.Ed. 750 (1950). Under these circumstances it is "consistent with a concept of administrative power which emphasizes a broad and continuing administrative initiative. * * * " to gauge the Commission's action by the public interest, rather than by its previous statements. See Jaffe, Judicial Control of Administrative Action 714 (1965). And, when the Commission reheard the case in 1966, it did consider as new evidence the 1924 Agreement and the implications and practices thereunder, in accordance with the direction of the remanding district court.

The Commission found that pursuant to said agreement:

"In December 1946, representatives of the parties adopted a map on which areas are marked 'as the areas described in the [1924] agreement although the said representatives recognize that the areas so marked are not precisely those described in the language of the agreement and that they are not authorized to modify or supplement the said agreement.' The eastern territory outlined includes western trunkline territory west of the Missouri River in Colorado, Wyoming, Kansas, Nebraska, South Dakota, and North Dakota. Southern Pacific also solicits and routes traffic via Union Pacific from and to Nevada and Utah, and in Oregon, North of Kirk, to but not including Portland.

"Southern Pacific has also agreed to preferentially solicit and route via Ogden and the Union Pacific (1) export and import traffic moving through California ports in the western preferred territory; (2) traffic from or to points on lines constructed or acquired subsequent to the Commission's 1923 order; and (3) traffic requiring stop to complete loading or to partially unload within the preferred western territory where the western origin or destination is located outside of such territory."

The testimony of traffic managers for the plaintiffs indicated that all freight agents were frequently and fully instructed to carry out the solicitation and routing practices outlined by the agreement.

Our National Transportation Policy is said to be "the yardstick by which the correctness of the Commission's actions will be measured." Schaffer Transp. Co. v. United States, 355 U.S. 83, 87–88, 78 S.Ct. 173, 176, 2 L.Ed.2d 117 (1957), as recently cited with approval in American Trucking Assoc., Inc. v. Atchison, T. & S. F. Ry., 387 U.S. 397, 421, 87 S.Ct. 1608, 18 L.Ed.2d 847 (1967). Mr. Justice Clark stated in

Baltimore & O. R.R. v. United States, 386 U.S. 372, 386, 87 S.Ct. 1100, 1107, 18 L.Ed.2d 159 (1967):

"This Court has often pointed out that the national transportation policy 'is the product of a long history of trial and error by Congress. * * *.' McLean Trucking Co. v. United States, 321 U.S. 67, 80, 64 S.Ct. 370, 88 L.Ed. 544 (1944). In that case it found that the Transportation Act of 1920 'marked a sharp change in the policies and objectives embodied in those efforts.' [Ibid.] In that Act the Congress directed the Commission to adopt a plan for consolidation of the railroads of the United States into 'a limited number of systems.' 41 Stat. 481 (1920). Consolidation would be approved by the Commission upon a finding that the transaction was in harmony with and in furtherance of the complete plan of consolidation and that the public interest would be promoted. *But the Commission was warned that 'competition shall be preserved as fully as possible.'* [Ibid.] The initiation of this unification, however, the Congress left wholly with the carriers. The Commission was given no power to compel mergers. *This pattern was carried forward in the Transportation Act of 1940, 54 Stat. 898; however, § 5 of the former Act was amended to authorize the Commission to approve carrier-initiated proposals which it found to be consistent with the public interest and upon just and reasonable conditions.*" (Emphasis ours.)

And Mr. Justice Brennan in a concurring opinion, 386 U.S. at 402, 87 S.Ct. at 1116, observed:

"The ICC has recognized that inquiry into a proposed transaction does not end with the possibilities for increased economies, but extends to 'the effect of the transaction upon adequate transportation service to all parts of the public which would be so affected, * * *.'" [14]

Here, the Commission determined that the routes of the Southern Pacific formed at Ogden with the Union Pacific and the Rio Grande are now "substantially similar." Although the 1962 and the 1966 Commission orders lend appearance, as Mr. Justice Douglas says in Baltimore & O. R.R. v. United States, supra, 386 U.S. at 449, 87 S.Ct. at 1141 (dissenting in part), of having been "decided by different regulatory bodies rather than the same commission," nevertheless we feel there exist sufficient findings to support modification of condition (e) as being no longer "just and reasonable" nor in accord with the "public interest."

■■ In this regard, it should be recalled that it is only "our task to scrutinize the Commission's authority, not the substance of its exercise." American Trucking Assoc., Inc. v. Atchison, T. & S. F. Ry., supra, 387 U.S. at 412, 87 S.Ct. at 1617. As Mr. Justice Frankfurter said in Rochester Telephone Corp. v. United States, 307 U.S. 125, 145–146, 59 S.Ct. 754, 764, 83 L.Ed. 1147 (1939):

"So long as there is warrant in the record for the judgment of the expert body it must stand. * * * Having found that the record permitted the Commission to draw the conclusion that it did, a court travels beyond its province to express concurrence therewith as an original question. 'The judicial function is exhausted when there is found to be a rational basis for the conclusions approved by the administrative body.'"

PRACTICES UNDER 1924 AGREEMENT.

■ Despite the admonition of the District Court of Colorado that the agreements and practices arising from condition (e) must be considered together with the condition itself, plaintiffs nevertheless urge that their practices were not specifically passed upon, and that the 1924 agreement can survive with or without the modification of con-

14. Citing Chicago, B. & Q. R. Co.—Control, 271 I.C.C. 63, 146. See also Detroit, T. & I. R. Co.—Control, 275 I.C.C. 455, 489, sustained sub nom. New York, C. & St. L. R.R. v. United States, 95 F.Supp. 811 (N.D.Ohio 1951).

dition (e) in the *Control* proceedings. There are many reasons why this position must fail.

First, we defer to the approach of the Colorado District Court in construing the condition, agreement and practices as one issue. Notwithstanding plaintiffs' protestations of their own use of awkward language in their 1924 agreement, we join in the observation of the Commission that the agreement was devised for "the stated purpose of arriving at a common understanding of the meaning of the conditions and for making them reciprocally obligatory. * * *" With condition (e) modified, any authority for preferential routing or solicitation between the Union Pacific and Central Pacific must cease. See note 1, supra.

Secondly, these practices between the parties, as we have observed, are not required by the Pacific Railroad Acts, but in fact are in direct contravention of them. The only possible sanction for the practices and the agreement was the original 1923 version of condition (e), which embodied a Commission-approved exemption pursuant to a provision of the Transportation Act of 1920, now codified as 49 U.S.C. § 5(11). However, it is seriously in doubt whether within the *Control* proceedings the Commission could authorize the Union Pacific to preferentially solicit and route for the Southern Pacific (Central Pacific) in

contravention of the Pacific Railroad Acts.

It is true that the Commission under Section 5(11) of the Act could grant immunity from the "antitrust laws" as well as from "all other restraints, limitations and prohibitions of law." But it is important to consider that immunity can only be given under Section 5(11) to those "carriers * * * participating in a transaction approved or authorized under * * * this section * * *." The Union Pacific was not a "carrier * * * participating" in the merger or lease and stock acquisition of the Central Pacific by Southern Pacific. It is true they intervened to file objections, but it is agreed that the Commission had no jurisdiction over the Union Pacific to impose obligations on it. As the Commission acknowledges, the Union Pacific only acquiesced in the proceedings and conditions set forth.[15] Under these circumstanstances, the Commission had no authority to relieve the Union Pacific from any "restraints * * * or prohibitions of law" under Section 5(11). In any event it should be clear, as we have observed, that by modification of condition ·(e) the Commission has removed any ostensible approval for discrimination by the parties.

Third, the Commission observed that both practices are contrary to the national transportation policy, as declared by the Transportation Act of 1940.[16] As

15. "Conditions (a) through (d) generally require the Southern Pacific to cooperate or join with the Union Pacific in maintaining service, schedules, and rates via the Ogden gateway and the line of the Central Pacific.

"It was observed in the *Control* case that there was no jurisdiction therein to enforce an order against the Union Pacific or carriers other than the Southern Pacific and Central Pacific. However, the Union Pacific accepted and approved the conditions made, as they apply to the Southern Pacific and its constituent lines, and evinced its intention to comply therewith so far as its cooperation was necessary or required." 317 I.C.C. at 472.

16. "It is hereby declared to be the national transportation policy of the Congress

to provide for fair and impartial regulation of all modes of transportation subject to the provisions of this Act [chapters 1, 8, 12, 13, and 19 of this title], so administered as to recognize and preserve the inherent advantages of each; to promote safe, adequate, economical, and efficient service and foster sound economic conditions in transportation and among the several carriers; to encourage the establishment and maintenance of reasonable charges for transportation services, without unjust discriminations, undue preferences or advantages, or unfair or destructive competitive practices; to cooperate with the several States and the duly authorized officials thereof; and to encourage fair wages and equitable working conditions;

the Commission has observed, the preferential solicitation and routing by the plaintiffs "tends to relegate the Rio Grande to a secondary status as a transcontinental carrier." The Commission found that the preferential soliciting and routing "stifle competition"; that the "public welfare" and "national defense" are better served by the maintenance of several strong, central transcontinental routes; and that "equality of treatment" must be a dominant consideration when dealing with competing lines that are "substantially similar," such as the Union Pacific and the Rio Grande.

■ The Commission's discretionary appraisal of the facts with regard to the national transportation policy must stand if there is evidence to warrant the decision. McLean Trucking Co. v. United States, 321 U.S. 67, 64 S.Ct. 370, 88 L.Ed. 544 (1944). Mr. Justice Rutledge commented in *McLean:*

"The national transportation policy requires the Commission to 'promote * * * economical * * * service and foster sound economic conditions in transportation and among the several carriers; to encourage the establishment and maintenance of reasonable charges for transportation services, without unjust discriminations, [or] undue preferences or advantages * * *.'"

"In short, the Commission must estimate the scope and appraise the effects of the curtailment of competition which will result from the proposed consolidation and consider them along with the advantages of improved service, safer operation, lower costs, etc., to determine whether the consolidation will assist in effectuating the over-all transportation policy. Resolving these considerations is a complex task which

requires extensive facilities, expert judgment and considerable knowledge of the transportation industry. Congress left that task to the Commission 'to the end that the wisdom and experience of that Commission may be used not only in connection with this form of transportation, but in its coordination of all other forms.' 79 Cong.Rec. 12207. 'The wisdom and experience of that commission,' not of the courts, must determine whether the proposed consolidation is 'consistent with the public interest.' Cf. Interstate Commerce Commission v. Illinois Central R. Co., 215 U.S. 452, [30 S.Ct. 155, 54 L. Ed. 280;] Pennsylvania Co. v. United States, 236 U.S. 351, [35 S.Ct. 370, 591 L.Ed. 616;] United States v. Chicago Heights Trucking Co., 310 U.S. 344, [60 S.Ct. 931, 84 L.Ed. 1243]; Purcell v. United States, 315 U.S. 381, [62 S. Ct. 709, 86 L.Ed. 910]. If the Commission did not exceed the statutory limits within which Congress confined its discretion and its findings are adequate and supported by evidence, it is not our function to upset its order." 321 U.S. at 86–88, 64 S.Ct. at 380.

Public interest germane to this case includes (1) adequacy of service, (2) economy and (3) the efficient use of transportation facilities. See New York Central Securities Corp. v. United States, 287 U.S. 12, 24–25, 53 S.Ct. 45, 77 L.Ed. 138 (1932). But also, until we totally evolve a new approach toward railroad consolidation,[17] Congress requires the Commission, as well as the courts, to give "consideration of all important consequences including anticompetitive effects." Denver & R. G. W. R.R. v. United States, 387 U.S. 485, 492, 87 S.Ct. 1754, 1759, 18 L.Ed.2d 905 (1967).

■ Finally, the Commission determined that the preferential *routing* of

—all to the end of developing, coordinating, and preserving a national transportation system by water, highway, and rail, as well as other means, adequate to meet the needs of the commerce of the United States, of the Postal Service, and of the national defense. All of the provisions of this Act [chapters 1, 8, 12, 13, and 19 of this title] shall be administered and enforced with a view to carrying out the above declaration of policy." 49 U.S.C. (prior to § 1).

17. See National Transportation Policy, S. Rep.No. 445, 87th Cong., 1st Sess. 260–61 (1961).

traffic not routed by the shipper was a direct violation of Section 3(4) of the Interstate Commerce Act. Section 3(4) reads in part as follows: "All carriers * * * shall not * * * unduly prejudice any connecting line in the distribution of traffic that is not specifically routed by the shipper."

Plaintiffs urge that this holding is erroneous since there exists no proof (other than evidence received in 1922 that at that time from 2 to 4 per cent of the freight was unrouted) that sufficient shipping was affected to create "undue prejudice" at the present time by reason of the preferential routing. However, this overlooks the fact that the agreement attacked involves preferential solicitation as well as preferential routing, and that between the two practices 100 per cent of the freight originated by the plaintiffs and *not routed before the railroad is contacted,* is either solicited or directly routed for the plaintiffs.[18]

The prohibition of Section 3(4) is against discriminatory conduct of the carrier against connecting lines. The Act cannot be circumvented by wrongfully inducing the shipper to commit the discrimination in place of the carrier. In other words, the legislation is not to be so weakly construed that it permits the carrier to accomplish indirectly what he cannot do by direct preferential routing. In view of the clear policy expressed by the statute, we see no meaningful distinction between arbitrarily soliciting the unrouted freight at that time and arbitrarily routing it should the shipper leave it unrouted.

■ The statute must be interpreted broadly to effectuate its purposes in the public interest. B & C Truck Leasing, Inc. v. I. C. C., 283 F.2d 163, 164–165 (10 Cir. 1960). As is stated in the Shreveport case, Houston, East & West Texas R. Co. v. United States, 234 U.S. 342, 356, 34 S.Ct. 833, 838, 58 L.Ed. 1341 (1914), "there is no basis for the contention that Congress intended to exempt any discriminatory action or practice of interstate carriers affecting interstate commerce which it had authority to reach." In Western Pac. R.R. Co. v. United States, 382 U.S. 237, 244, 86 S.Ct. 338, 343, 15 L.Ed.2d 294 (1965), the Supreme Court said:

"In the absence of any settled construction of § 3(4), then, its manifest purpose to deprive railroads of discretion to apportion economic advantage among competitors at a common interchange must be the basic guide to decision."

■ Thus, we feel that preferential solicitation when done on a "preconcerted" and "systematic" discriminatory basis, as conducted by the parties herein, falls within the statutory prohibition of Section 3(4) as well. The preferential solicitation dictated by the agreement is without concern for competitive benefits of similar lines and without relationship to the best possible service to the shipper. It is as much an apportionment of "economic advantage" as direct routing itself. As plaintiffs argue, preferential solicitation has been referred to without disapproval by the Commission occasionally under *special circumstances.* See, e. g., Chicago, I. & L. Ry. Co. Reorganization, 254 I.C.C. 539, 557, 559 (1943), 254 I.C.C. 673, 689 (1944); Minneapolis, St. P. & S. S. M. Ry. Co. Reorganization, 252 I.C.C. 525, 574–75, 252 I.C.C. 615, 653 (1942). Of course the present case where Southern Pacific was obliged to solicit for the Central Pacific route rather than its own El Paso route is another example. But special circum-

---

18. The agreement states, "the parties * * * shall cooperate to secure by active solicitation the *routing of the maximum* of freight traffic via Union Pacific and Central Pacific lines * * *.

"It is understood that such traffic as has origin or destination east of the Missouri River will be *solicited and routed* via the Union Pacific between the Missouri River and Ogden, and via the Southern Pacific west of Ogden; such traffic as has origin or destination west of the Missouri River will be *solicited and routed* via Ogden so as to afford Union Pacific and Southern Pacific respectively the longest practicable haul." (Emphasis ours.)

stances were involved, such as the reorganization and merger of two formerly separate lines. Discrimination on a purely arbitrary anticompetitive basis, where the connecting lines prejudiced offer equal facilities and service, is far outside the scope of permissible activity and must be disapproved.[19]

Since *all* freight that is not independently routed by the shipper is solicited or routed discriminatorily to the prejudice of the Rio Grande, Section 3(4) prohibits both such practices as being "unduly prejudicial," without further facts before us.

The Commission applied Section 3(4) only to the preferential routing. We are cognizant that we are "powerless" to affirm discretionary agency action other than on the grounds invoked by the agency. Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 169, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962). However, in the construction of Section 3(4), we are not reviewing agency discretion. And although fully relying upon the expertise of the Commission in review of this entire matter, apropos is Professor Jaffe's statement:

> "The judgment of the expert may, as we have seen, be relevant to the decision, but it cannot by reason of its 'pure' quality, its specifically expert

character, transform a question of law into a question of fact and so insulate the decision from legal judgment." Jaffe, Judicial Control of Administrative Action, p. 580 (1965).

Other arguments are made by the defendants and intervenors concerning violation of Section 15(1) and of the antitrust laws. Since the Commission has not relied upon these grounds, they require no discussion.

■ In conclusion, we find no authority under (1) the Pacific Railroad Acts, (2) the National Transportation Policy or (3) Section 3(4) of the Interstate Commerce Act for the plaintiffs' discriminatory routing and solicitation agreement or practices, or for the retention of the original condition. We find the Commission made adequate findings to support the modification of its 1923 order under Section 5(2) of the Interstate Commerce Act.

We deny plaintiffs' request to enjoin, set aside, annul and suspend the supplemental order of the Commission dated January 6, 1966, entered in Finance Docket No. 2613, Control of Central Pacific by Southern Pacific, and accordingly dismiss the complaint and enter judgment for the defendants herein

It is so ordered.

19. As the parties, including the Interstate Commerce Commission, have observed in their briefs and arguments, solicitation on a reciprocal basis, as well as routing, are to some degree found in industry practices. We note the discussion in Conant, Railroad Mergers and Abandonments 34–35 (1964):

> "If the shipper does not control the entire routing of shipment, the initial carrier will be free to choose which connecting carriers will transport the shipment to its final destination. At major connecting points, such as Chicago, St. Louis, Kansas City, and Omaha, an initiating carrier must choose which of a number of connecting lines should receive shipments bound for major cities on two or more routes. In the absence of price competition, the choice is usually made on the principle of reciprocity. A railroad transfers to connecting carriers as many cars as it receives from them, or, if traffic is not

> balanced in both directions, a railroad transfers cars to connecting carriers in some proportion to cars received.

> "But the reciprocity of interchange of connecting railroads is not short-term. A railroad will develop long-run interchange preference patterns to protect its own longest hauls by favoring connecting carriers that are not its rivals for any segment of traffic. Thus, the Chicago and North Western, which has a main line from Chicago to Omaha, has established wide interchange with the complementary Union Pacific which extends from Omaha west to Denver, Ogden, and Portland. Neither the North Western nor the Union Pacific has substantial interchange at Omaha with the Rock Island or the Burlington, both of whose lines run from Chicago to Denver and thus rival the North Western and part of the Union Pacific."

APPENDIX A

Southern Pacific ————
Central Pacific ▼•••••
Union Pacific •—•—•
Denver & Rio Grande ╫╫╫╫
Western Pacific ——

---

RICHARD E. ROBINSON, District Judge (dissenting).

I would respectfully submit that the construction of the Pacific Railroad Acts offered by the majority relies too heavily upon a 1967 interpretation of the language chosen. "Discrimination" has become colored by its present use in the Interstate Commerce Act; "branch lines" have assumed proportions far beyond those obviously contemplated by the Acts. One could hardly expect to find language in the Pacific Railroad Acts which would specifically guard against the application of an Interstate Commerce Act not yet envisioned; and any argument based on its absence could not survive its own statement.

The Congress designed the system so that "branch lines" would connect with the "main trunk";[1] the question remains whether they could foresee competing systems. A word used indicates that they did not.

"* * * the several companies * * * are hereby required to operate * * * as *one* continuous line."

I am constrained to find the "branches" to which discrimination was forbidden were feeder lines, not competitors. The "discrimination" referred to

---

1. "Branch lines" and "main trunk" were the descriptions often given of the system in the Congressional debates; in particular the quotation offered by the majority. Cong. Globe 37th Cong.2nd Session, 2807 [1862].

appears to have been directed, in addition to the two segments of the "main trunk", to the branches who were to compete between themselves, not with the "one continuous line".[2] I believe that Congress intended to create one railroad; the two organizations were formed to accomplish this end and were not intended to diminish their right to operate as such. I would agree that the obligations of the parties under the Acts were fulfilled by mere physical connection and the absence of discrimination between themselves and their branches, but I would not equate fulfillment of duty with exhaustion of rights. The duty of preferential solicitation and routing arises from the control of Central Pacific by Southern Pacific and the arrangements which resulted. In other words, if my interpretation is correct, the Pacific Railroad Act gives the parties the right to agree to exert in concert any lawful competitive force available to them; the control of Central Pacific by Southern Pacific demands that such an agreement be made.

It is also worth noting that the separate companies were given the express right to consolidate their corporate structures. Act of July 2, 1864, ch. 216, § 16, 13 Stat. 363.

I do not agree that the cases cited in the majority opinion add weight to the position therein taken. In particular, I cannot agree that in the case of Union Pac. Ry. Co. v. Chicago, R. I. & P. Ry. [supra][3] the Supreme Court enjoined "discriminatory practices" under the authority of the Pacific Railroad Acts. Reference to the Acts gave support to the Court's finding of Congressional policy; neither the questions involved nor the answers given shed light here. The other authorities might well be cited in favor of the position taken by the Union Pacific as well as those conclusions for which they were cited. Each of the cases refer to the "main line" and "connecting branches." I would not agree that the language can be transplanted to apply equally to competing

2. Senator Sherman offered the following argument for private ownership of the branch lines: "I hope that this proposition, which will add another prong to this many-pronged railroad, will be voted down, and that the proposition of the Senator from New Hampshire will be adopted, and that we may agree upon the construction of one main Pacific railroad, which may be promptly constructed, and give such reasonable aid as we can to diverging routes, all pointing to the main line, and I think that all these diverging lines ought to be under different corporations. There is one part of this bill that I do not like. I do not wish to criticise it, but I do not think the Pacific Railroad Company ought to build any of these diverging lines. They ought to be built by different companies so that all the diverging lines will compete with each other, and compete with each other fairly, while they all pour their streams of commerce into one great line, which is aided by the Government. But under the operation of the bill as you have it now framed, the Pacific Railroad Company will own one of these branch lines, and may to the sacrifice of other interests involved in these roads divert the whole travel and transportation to one line, thus destroying the property in which you yourself invest to the tune of $16,-

000 a mile. I think it would be much wiser to leave these various branches to be built by the local interests concerned." Cong.Globe, 37th Cong., 2nd Sess., 2784 [1862].

3. That case was an action for specific performance of certain contracts entered into by the Union Pacific and the Chicago, Rock Island and Pacific Railway Company and the Chicago, Milwaukee and St. Paul Railway Company in which the Union Pacific had leased the use of their bridge across the Missouri to the two latter named companies. The Union Pacific claimed that it had no authority to lease the use of its lines and that the contract was therefore ultra vires. The Court found that the contract did not disable the Union Pacific from fulfilling its obligations to the public. The Court then cited the Pacific Railroad Acts as authority for the proposition that the Congressional policy favored "continuous lines". "It is impossible for us to ignore the great public policy in favor of continuous lines thus declared by congress, and that it is in effectuation of that policy that such business arrangements as will make such connections effective are made." Union Pacific Ry. Co. v. Chicago, R.I. and P. Ry. Co., 163 U.S. 564, at 589, 16 S.Ct. 1173, at 1183, 41 L.Ed. 265.

systems. Each of the cases recognize that the Acts demand something more than mere physical connection.[4]

The position I have taken is not novel. It was stated by the Interstate Commerce Commission when it originally adopted the five conditions now under review, and cited as the correct interpretation when the Commission first ruled on the petition for reopening and modification. The following is taken from Control of Central Pacific by Southern Pacific, 317 I.C.C. 469, at 484:

> "The existing conditions are consistent with the stated purposes of the Pacific Railroad Acts, and one of the purposes of those conditions is to protect the rights of the Union Pacific and the public under those acts, which are still in force and effect. In imposing the conditions, we stated:
>
>> 'By virtue of the Pacific Railroad acts the Union Pacific and Central Pacific have certain reciprocal rights, including the right to cooperation in the establishment and maintenance via the Central Pacific-Union Pacific route of through train service and joint rates reasonably necessary to meet competition by other routes, and to cooperation in other respects, to the end that the lines of said companies shall be operated and used as one connected, continuous line. We think that the rights of the Union Pacific and all interests of the public under the Pa-

cific Railroad acts may be protected by imposing upon the acquisition and exercise of control by the Southern Pacific the five conditions set out above. * * *'

The proposed modified condition is directed solely to the protection of the Central Pacific line and, thus, would favor it over the Union Pacific line. Although the proposed modified condition is directed toward continued protection of the Central Pacific line, it would fall short of its purpose as the Union Pacific could not be expected to preferentially solicit for that line in the absence of a reciprocal obligation upon the Southern Pacific. It is clear that mere physical connection does not satisfy the purposes of the Pacific Railroad acts; and it is noteworthy that both the 1862 act and the 1864 act authorized the roads concerned 'to form themselves into one consolidated company.' "

Even counsel for the Government expressed a similar view of the proper construction of the acts in his argument of United States v. Southern Pac. Co., 259 U.S. 214, at p. 217, 42 S.Ct. 496, 66 L. Ed. 907 [1922]:

> "The Pacific Railroad laws imposed on the franchise of the Central Pacific Railroad and on the franchise of the Union Pacific Railroad the reciprocal duty of the one railroad not to discriminate against the other in favor of any other railroad, *but to exert to-*

---

4. I refer particularly to United States v. Union Pac. R.R., 226 U.S. 61, 33 S.Ct. 53, 57 L.Ed. 124 [1912]. As I read that case the Court made two observations which are important here. First, they found that the Pacific Railroad Acts require more than mere physical connection. The Court then listed reasons why they believe that physical connection was not the only requirement; but they did not proceed to define the obligations which did exist. Some light is shed on the question, however, by another comment contained in that opinion. While the Court was not disturbed about discrimination by Southern Pacific against the Rio Grande, they stated definitely that such discrimination against the Union Pacific would be contrary to the Act.

"Such practices of systematic and preconcerted discrimination as are said to have destroyed the Rio Grande's carrying trade as a connection for the East for business at Ogden would have violated the statute as discriminations adverse to the Union Pacific and be equally violative of the letter and spirit of the acts of Congress. * * *" 226 U.S. at 92, 33 S.Ct. at 59.

I believe that the opinion clearly indicates that the Union Pacific and Central Pacific were to be given special treatment because of the Acts that created them. While the extent of their rights is not defined, their existence is nevertheless acknowledged.

*gether in normal voluntary cooperation all of the natural forces of a single railroad naturally competing with the parallel Southern Pacific Railroad * * *."* [Emphasis supplied]

Most persuasive, in my opinion, is the fact that the Interstate Commerce Commission has recognized and the Pacific railroads themselves have operated under this interpretation for a long period of time. This "long-continued reliance", was made an express finding in the Commission's 1962 decision. Control of Central Pacific by Southern Pacific [supra at p. 483]. It is undisputed that the Rio Grande had aspirations at the time the nine conditions were imposed of becoming competitive with the Union Pacific. The Rio Grande participated in the *Control* case; the conditions affected the operation of that route to a certain extent when imposed; the interpretation of the Pacific Railroad Acts was clearly stated; and the conditions were accepted as reflecting the law up until 1957. The rights which are reflected in "condition e" were granted by the Congress; they cannot be deleted by the Commission. I must therefore, respectfully dissent.