SOUTHERN PACIFIC TRANSPORTA-
TION COMPANY and St. Louis South-
western Railway Company, Petitioners,

v.

INTERSTATE COMMERCE COMMIS-
SION and United States of
America, Respondents,

Denver & Rio Grande Western Railroad
Company, Atchison, Topeka & Santa
Fe Railway Company, Union Pacific
Corporation, et al., and Chicago &
North Western Transportation Compa-
ny, Intervenors.

DENVER & RIO GRANDE WESTERN
RAILROAD COMPANY, Petitioner,

v.

INTERSTATE COMMERCE COMMIS-
SION and United States of
America, Respondents,

Chicago & North Western Transporta-
tion Company, Intervenor.

Edward K. WHEELER, Petitioner,

v.

INTERSTATE COMMERCE COMMIS-
SION and United States of
America, Respondents,

Chicago & North Western Transporta-
tion Company, Intervenor.

KANSAS CITY SOUTHERN RAILWAY
COMPANY and Louisiana & Arkansas
Railway Company, Petitioners,

v.

INTERSTATE COMMERCE COMMIS-
SION and United States of
America, Respondents,

Chicago & North Western Transportation
Company, Union Pacific Railroad Com-
pany, Denver & Rio Grande Western
Railroad Company, Atchison, Topeka &
Santa Fe Railway Company, Southern
Pacific Transportation Company, and
St. Louis Southwestern Railway Com-
pany, Intervenors.

ATCHISON, TOPEKA & SANTA FE
RAILWAY COMPANY, Petitioner,

v.

INTERSTATE COMMERCE COMMIS-
SION and United States of
America, Respondents,

Union Pacific Railroad Company, et al.,
Denver & Western Railroad Company,
and Chicago & North Western Trans-
portation Company, Intervenors.

BROTHERHOOD OF MAINTENANCE
OF WAY EMPLOYEES, Brotherhood
of Railway Signalmen, Brotherhood of
Railway & Airline Clerks, International
Association of Machinists & Aerospace
Workers, and United Transportation
Union, Petitioners,

v.

INTERSTATE COMMERCE COMMIS-
SION and United States of
America, Respondents,

Union Pacific Railroad Company, et al.,
and Chicago & North Western Trans-
portation Company, Intervenors.

ATCHISON, TOPEKA & SANTA FE
RAILWAY COMPANY, Petitioner,

v.

UNITED STATES of America and
Interstate Commerce Commission,
Respondents,

Union Pacific Railroad Company, et al.,
and Denver & Rio Grande Western
Railroad Company, Intervenors.

AMERICAN TRAIN DISPATCHERS
ASSOCIATION, Petitioner,

v.

INTERSTATE COMMERCE COMMIS-
SION and United States of
America, Respondents,

Chicago & North Western Transporta-
tion Company, Intervenor.

Nos. 82–2253, 82–2323, 82–2342, 82–2370,
82–2371, 82–2418, 82–2430 and 82–2479.

United States Court of Appeals,
District of Columbia Circuit.

Argued June 6, 1983.

Decided May 22, 1984.

Richard L. Dashefsky, Washington, D.C., for petitioners in No. 82–2253. William R. Hyde, Jr., Robert C. Eager, and Peter Sullivan, Washington, D.C., entered appearances for petitioners in No. 82–2253.

John H. Caldwell, Washington, D.C., with whom Kendall T. Sanford, Denver, Colo., and Denise M. O'Brien, Washington, D.C., were on the brief, for petitioner in No. 82–2323, and intervenor in Nos. 82–2371 and 82–2430. John G. DeGooyer, Washington, D.C., entered an appearance for petitioner in No. 82–2323.

Richard H. Streeter, Washington, D.C., for petitioner in No. 82–2342. Edward K.

Wheeler, Washington, D.C., entered an appearance for petitioner in No. 82–2342.

Joseph Auerbach, Boston, Mass., for petitioners in No. 82–2370. Haywood H. Hillyer, Jr., New Orleans, La., David M. Schwartz, Robert L. Calhoun, and Morris Raker, Boston, Mass., entered appearances for petitioners in No. 82–2370.

Dennis W. Wilson, Chicago, Ill., with whom Milton E. Nelson, Jr., and Robert R. Cowell, Chicago, Ill., were on the brief, for petitioner in Nos. 82–2371 and 82–2430. Richard E. Weicher, Chicago, Ill., entered an appearance for petitioner in No. 82–2371.

John O'B. Clarke, Jr., Washington, D.C., with whom Kimberly A. Madigan, Washington, D.C., was on the brief, for petitioner in No. 82–2418.

Gordon P. MacDougall, Washington, D.C., was on the brief for petitioner in No. 82–2479.

Henri F. Rush, Associate Gen. Counsel, I.C.C., Interstate Commerce Commission, Washington, D.C., with whom John Broadley, Gen. Counsel, and Laurence H. Schecker and John J. McCarthy, Jr., Attys., I.C.C., John J. Powers, III, and Neil R. Ellis, Attys., Dept. of Justice, Washington, D.C., were on the joint brief, for respondents. Nancy C. Garrison and Kenneth P. Kolson, Attys., Dept. of Justice, Washington, D.C., entered appearances for respondents.

Fritz R. Kahn, William C. Evans, L. John Osborn and Elizabeth A. Campbell, Washington, D.C., were on the brief for intervenor Chicago & North Western Transp. Co.

M. Lauck Walton, New York City, was on the brief for intervenors Missouri Pacific Corp. and Missouri Pacific R. Co.

Charles A. Miller, Joanne B. Grossman and Gregg H. Levy, Washington, D.C., were on the brief for intervenors Union Pacific Corp., et al.

Walter G. Treanor, Sacramento, Cal., entered an appearance for intervenor Western Pacific R. Co.

Before WRIGHT, MIKVA and BORK, Circuit Judges.

Opinion PER CURIAM.

PER CURIAM.

The Interstate Commerce Commission decision that gives rise to these appeals responds to applications seeking authority for the Union Pacific Corporation (UPC) and its subsidiaries to acquire and exercise control over Missouri Pacific Corporation (MPC) and its carrier subsidiaries, and over Western Pacific Railroad Company (WP) and its carrier subsidiaries. Under the proposed consolidations the existing railroads and holding companies will retain their separate corporate identities but will be under the control of UPC and a new railroad holding company, Pacific Rail System, Inc. (PRSI). After extensive hearings, the Commission approved the consolidations, subject to certain conditions. *Union Pacific Corp., Pacific Rail System, Inc., and Union Pacific R.R.—Control—Missouri Pacific Corp. and Missouri Pacific R.R. [UPC-Control],* 366 I.C.C. 459 (1982).

*The Commission Decision*

The applications for authority to create the consolidations at issue were filed on September 15, 1980.[1] The Commission accepted these applications for filing and published notice of the filing in the *Federal Register,* 45 Fed.Reg. 68,484 (Oct. 15, 1980). In response a long list of shippers, railroads, labor organizations, state governments, federal agencies, and shareholders filed comments either supporting or opposing the proposed consolidations or, in the event of Commission approval, seeking imposition of conditions upon the consolidations.[2]

---

1. The case involves two separate applications. Union Pacific Corporation, Pacific Rail System, Inc., and Missouri Pacific Railroad Company jointly filed an application seeking authority for UPC to control MPC. At the same time UPC and Western Pacific Railroad Company jointly filed an application seeking authority for UPC to control WP.

2. For a useful summary of the positions taken toward the proposed consolidation by various parties, *see UPC-Control,* 366 I.C.C. at 474–482.

Public hearings were conducted before two Administrative Law Judges from March 3, 1981 until January 6, 1982. On October 20, 1982, the Commission issued its final decision approving the consolidations but attaching certain conditions.[3] The opinion explaining the Commission's decision is comprehensive, consisting of 166 pages with 12 appendices that comprise an additional 164 pages. *See UPC-Control,* 366 I.C.C. at 459–819.

In considering the applications to consolidate UPC, MPC and WP the Commission noted first that under the Interstate Commerce Act (the Act) it is required to approve the consolidation if it finds the transaction to be "consistent with the public interest." *See* 49 U.S.C. § 11344(c) (Supp. V 1981). The Commission looked to a variety of factors that Congress has directed it to consider in determining whether a proposed consolidation meets the Act's broad public interest standard. These factors include criteria set forth in the Interstate Commerce Act, 49 U.S.C. § 11344(b) (Supp. V 1981), including an additional criterion added by the Staggers Act, 49 U.S.C. § 11344(b)(3); the Transportation Policy of 49 U.S.C. § 10101 (Supp. V 1981), as amended by the Bus Regulatory Reform Act of 1982, Pub.L. No. 97–261, § 5, 96 Stat. 1103, and the Rail Transportation Policy of 49 U.S.C. § 10101a (Supp. V 1981); recent rail reform legislation, especially the Railroad Revitalization and Regulatory Reform Act of 1976, Pub.L. No. 94–210, 90 Stat. 31 (4R Act); antitrust legislation, especially the Clayton and Sherman Acts; and the Commission's own policy statement on rail consolidations, *Railroad Consolidation Procedures,* 366 I.C.C. 75 (1982), *see UPC-Control,* 366 I.C.C. at 483–87.

After considering this multitude of factors, the Commission weighed the public

benefits likely to result from the proposed consolidation against its likely harmful consequences. In evaluating the potential harm arising from the consolidation, the Commission stated that it was particularly attentive to detrimental effects upon competition, the essential services of competing carriers, and the interests of employees. *UPC-Control,* 366 I.C.C. at 487. The Commission concluded that the consolidation will result in substantial public benefits stemming from the improved efficiency and reliability of a single-system service. The Commission estimated that in quantitative terms the benefits will result in public savings of $47 million annually. *Id.*

On the other hand, the Commission observed that the proposed consolidation would entail certain negative consequences. Specifically, the Commission found that the proposed consolidation will have a significant adverse competitive effect on rail transportation of transcontinental traffic and on rail transportation in the Midwest. 366 I.C.C. at 533. The Commission, however, imposed conditions on the consolidations to allay these negative effects. As conditioned, the Commission found that the public benefits from the consolidations outweighed their negative effects. The Commission therefore approved the applications for consolidations, subject to the conditions it imposed. *Id.* at 642.

*The Conditions Imposed*

In deciding whether and what conditions to impose, the Commission's guide is the public interest. 49 U.S.C. § 11344(c). The conditions at issue were initially proposed by competitors or other opponents of the carriers seeking consolidation. In general, these opponents sought to convince the Commission to disapprove the consolidation altogether. Failing that, they sought to convince the Commission to impose condi-

---

**3.** At a press conference on September 13, 1982, the chairman of the Commission announced that the Commission had voted to approve the consolidations, with conditions, and that the decision of the Commission would be issued on or before October 20, 1982. That announcement immediately gave rise to a petition for review. This court dismissed that petition, how-

ever, because it was filed before the Commission's issuance of a final order. *Southern Pacific Transportation Co. v. ICC,* No. 82–2057 (D.C. Cir. Nov. 15, 1982). *See also Denver & Rio Grande Western R.R. Co. v. United States,* No. 82–2106 (10th Cir. Nov. 2, 1982) (dismissing related petition on same basis).

tions upon the consolidation that would lessen its impact upon their interests. The Commission adopted some of their proposals but rejected others.[4]

Kansas City Southern Railway Company (KCS) sought (1) imposition of trackage rights over MPC lines, (2) the right to purchase segments of MPC right-of-way trackage, and (3) certain traffic-protective conditions. The Commission denied all of KCS's proposed conditions. It rejected empowering KCS with trackage rights and the right to purchase segments of MPC's right-of-way trackage because, in the Commission's view, neither of these conditions was shown to relate to the effects of the consolidation. The Commission rejected imposing traffic-protective conditions upon the consolidation on behalf of KCS because KCS had failed to demonstrate adequately its need for such protection. *See UPC-Control,* 366 I.C.C. at 593–97.

Denver & Rio Grande Western Railroad Company (DRGW) sought (1) trackage rights over lines owned by MPC and the Atchison, Topeka & Sante Fe Railway Company (ATSF), (2) independent ratemaking authority (IRA) over WP, and (3) traffic-protective conditions. The Commission granted DRGW's request for trackage rights, noting that this condition will mitigate competitive harms resulting from the consolidation, that it is operationally feasible, and that any harm the condition might cause to the consolidated system will be outweighed by the public benefit of added competition. 366 I.C.C. at 578. ATSF challenged that part of the Commission's order which provided DRGW with trackage rights over certain segments of ATSF lines. ATSF claimed that the Commission was without jurisdiction to impose trackage rights over these segments of its lines. The Commission rejected ATSF's challenge on the ground that the line segments at issue come within its statutory authority under 49 U.S.C. § 11103 (Supp. V 1981) to require terminal facilities, including main-

line tracks for a reasonable distance outside of a terminal, to be used by another rail carrier if the Commission finds that use to be practicable and in the public interest. 366 I.C.C. at 573–78.

The Commission denied DRGW's request for independent ratemaking authority and traffic-protective conditions. DRGW sought the merged system's automatic concurrence to rates set by DRGW when it uses a route which includes WP's northern California lines. The proposed independent ratemaking authority would enable DRGW to quote rates between northern California and Kansas City while providing service between Utah and Kansas City. The Commission rejected the proposal on the ground that empowering DRGW with the authority it sought would decrease its incentive to cooperate with another carrier, Southern Pacific Transportation Company (SP), in creating alternative services to those provided by the consolidated systems and therefore decrease overall competition. 366 I.C.C. at 578–79. The Commission rejected DRGW's request for traffic-protective conditions because, in its view, such conditions are generally anti-competitive and DRGW failed to show any special circumstances justifying imposition of such conditions. *Id.*

The Commission stated that in addition to considering the effects of the proposed consolidation upon competing carriers, it must also consider the interests of, and provide protection for, the employees of the consolidating carriers. *See* 49 U.S.C. §§ 11347 and 11344(b)(4) (Supp. V 1981). Labor organizations, including the Brotherhood of Maintenance of Way Employees (BMWE) and the American Train Dispatchers Association (ATDA), proposed imposing a wide variety of labor-protective conditions upon the consolidations. The Commission imposed what it describes as "the minimum protections to be afforded those employees affected by a consolidation, absent a voluntarily negotiated agreement."

---

**4.** We discuss only those proposals that are at issue in this appeal. For a summary of all the proposals directed to the Commission in these proceedings, *see UPC–Control,* 366 I.C.C. at 562–601.

*UPC-Control*, 366 I.C.C. at 619. These protections are derived from the Commission's decision in *New York Dock, New York Dock Ry.—Control—Brooklyn Eastern District*, 360 I.C.C. 60, *aff'd sub nom. New York Dock Ry. v. United States*, 609 F.2d 83 (2d Cir.1979). These protections include a mandated 90-day notice of employment actions, negotiated implementation of employment changes resulting from a consolidation with compulsory arbitration of disputes, and compensation for dismissed employees. The Commission rejected labor-protective conditions broader in scope than those established in *New York Dock* because, in the Commission's view, these organizations failed to show unusual circumstances which would warrant increased protection. *UPC-Control*, 366 I.C.C. at 620.

In deciding whether to approve the proposed consolidations, the Commission also considered whether the terms it offered to affected stockholders were fair and reasonable. *See* 49 U.S.C. § 11344; *Schwabacher v. United States*, 334 U.S. 182 (1948). Edward K. Wheeler, a minority stockholder of SP stock, objected to the $20 per share price offered for WP Class A common stock on the ground that that price fails to reflect the full range of WP's assets and is therefore unreasonably low. The Commission, using a different method of computation from that suggested by Wheeler, found that the $20 per share price was fair and rejected Wheeler's objection. *UPC-Control*, 366 I.C.C. at 632–40.

*Standard of Judicial Review*

The Interstate Commerce Act has empowered the Commission with broad authority to approve railroad consolidations and to impose conditions upon them. A corollary to this grant of wide authority is that courts must show considerable defer-

ence to the Commission's determinations. The Administrative Procedure Act (APA), 5 U.S.C. § 706 (1982), governs the scope of our review of the Commission. *See Illinois Central R.R. v. Norfolk & Western Ry.*, 385 U.S. 57, 66, 87 S.Ct. 255, 260, 17 L.Ed.2d 162 (1966); *Missouri-Kansas-Texas R.R. v. United States*, 632 F.2d 392, 399 (5th Cir.1980), *cert. denied*, 451 U.S. 1017, 101 S.Ct. 3004, 69 L.Ed.2d 388 (1981). Under the APA we must

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; [or]

\* \* \* \* \* \*

(E) unsupported by substantial evidence \* \* \*[.]

5 U.S.C. § 706(2)(A) & (E).

The Fifth Circuit has ably described the practical application of this standard to Commission decisions, observing that it is not a court's task "to re-weigh the evidence or to draw our own inferences from the evidence before the Commission. \* \* \* We can ask only whether the Commission has observed the statutory limits that Congress has set for its discretion, whether its action was arbitrary or capricious, or whether its findings are supported by adequate analysis and substantial evidence in the record considered as a whole." *Missouri-Kansas-Texas R.R. v. United States*, 632 F.2d at 398–99. If the Commission's decision meets these deferential standards, we must affirm it. We are persuaded that it does.

*Issues on Appeal*[5]

This appeal principally involves six issues. They are as follows:

---

**5.** This appeal marks the fourth time this court has encountered this case. We mention above that this court dismissed a petition for review that was filed prior to issuance of the Commission's final order. *See* note 3 *supra*. This court encountered this case a second time when petitions for review were filed immediately upon issuance of the Commission's final order. *Southern Pacific Transportation Co. v. ICC*, No.

82–2253 (D.C.Cir. filed Oct. 20, 1982). Petitioners filed motions to stay the Commission's decision. This court denied the motions for stay but entered a temporary stay to allow the parties to seek a stay from the Supreme Court. The Supreme Court also denied petitioners' request. Subsequently, two of the petitioners filed motions with this court requesting that it summari-

1. Did the Commission properly decide that the proposed consolidation is consistent with the public interest?

2. Did the Commission properly deny KCS's request for certain trackage rights?

3. Did the Commission have jurisdiction to order that certain segments of ATSF track be made available to SP and DRGW?

4. Did the Commission properly deny DRGW's request for independent ratemaking authority?

5. Did the Commission properly deny protective conditions requested by labor organizations?

6. Did the Commission properly evaluate the fairness of the price per share offered to minority shareholders of WP stock?

We affirm the Commission's decision on all issues except the fourth, which we remand to the Commission for further proceedings not inconsistent with this opinion. Additional, relatively minor, issues were raised by petitioners and will be referred to where appropriate. However, having carefully considered these subsidiary issues and the challenges giving rise to them, we find petitioners' arguments concerning these matters to be without merit.

### 1. *The Public Interest Decision*

Petitioners challenge the Commission's determination that the proposed consolidation is "consistent with the public interest" on a number of grounds. Petitioners' primary contention is that the ICC ignored Congress' directive that "competitive considerations and the policies of the antitrust laws assume critical and, indeed, controlling significance in any assessment of whether a merger should be approved." Brief for Petitioners SP at 14. Petitioners argue that the conceded anticompetitive effects of the merger outweigh any public benefits the merger may create. Brief of Petitioners KCS at 17–24. In addition, petitioners maintain that the ameliorative con-

ditions imposed on the merger by the ICC were insufficient to offset the anticompetitive consequences of the merged system. *See, e.g.*, Brief for Petitioner DRGW at 16.

### (a) *The role of competitive effects in the statutory scheme*

Petitioners' basic contention is that Congress has recently changed the law so as to forbid the Commission from approving any merger with admittedly anticompetitive effects such as this one. *See, e.g.*, Brief for Petitioners SP at 14 ("[T]he ICC … refused to employ a standard which incorporates recent changes in Congressional direction regarding the rail industry."). We do not agree that the Commission is required to give anticompetitive effects not merely substantial but dispositive weight. We think that the Commission properly recognized that while competition is a "major factor" in its calculus, its "primary inquiry" is still to be conducted under the terms of the Interstate Commerce Act. In deciding whether a proposed merger is "consistent with the public interest," 49 U.S.C. § 11344(c) (Supp. III 1979), the Commission has traditionally considered four factors:

1. the effect of the proposed transaction on the adequacy of transportation to the public.

2. the effect on the public interest of including, or failing to include, other rail carriers in the area involved in the proposed transaction.

3. the total fixed charges that result from the proposed transaction.

4. the interest of carrier employees affected by the proposed transaction.

49 U.S.C. § 11344(b) (Supp. III 1979). After this merger had been submitted to the Commission, Congress passed the Staggers Act, which added a fifth factor to this list: "whether the proposed transaction would have an adverse effect on competition among carriers in the affected area." 49 U.S.C. § 11344(b)(5) (Supp. IV 1980). Although the Staggers Act is not formally

ly reverse the Commission's decisions. These

motions, too, were denied.

applicable to this proceeding, the Commission elected to adhere to its policies. *UPC-Control*, 366 I.C.C. at 483. The Commission's determination as to a proposed merger is also guided by the criterion set forth in the Transportation Policy of 49 U.S.C. § 10101 (Supp. V 1981), as amended by the Bus Regulatory Reform Act of 1982, Pub.L. No. 97–261, § 5, 96 Stat. 1103,[6] the Rail Transportation Policy of 49 U.S.C. § 10101a (Supp. V 1981),[7] and the Railroad Revitalization and Regulatory Reform Act of 1976 (4R Act), which encourages "efforts to restructure the [railway system of the United States] on a more economically justified basis." 45 U.S.C. § 801 (1982). Taken together, these statutes, both new and old, evince Congress' intent that a merger's effects on competition be accorded substantial weight in determining whether the merger should be approved. The recent changes—more specifically, the Staggers Act and section 10101a—have not, however, changed the law so drastically such that the Commission was incorrect in stating that its "primary inquiry is conducted under the terms of the Interstate Commerce Act." 366 I.C.C. at 503. The very terms of the relevant statutes, focusing as they do on numerous factors in

6. 49 U.S.C. § 10101

(a) Except where policy has an impact on rail carriers, in which case the principles of section 10101a of this title shall govern, to ensure the development, coordination, and preservation of a transportation system that meets the transportation needs of the United States, including the United States Postal Service and national defense, it is the policy of the United States Government to provide for the impartial regulation of the modes of transportation subject to this subtitle, and—

(1) in regulating those modes—

(A) to recognize and preserve the inherent advantage of each mode of transportation;

(B) to promote safe, adequate, economical, and efficient transportation;

(C) to encourage sound economic conditions in transportation, including sound economic conditions among carriers;

(D) to encourage the establishment and maintenance of reasonable rates for transportation, without unreasonable discrimination or unfair or destructive competitive practices;

(E) to cooperate with each State and the officials of each State on transportation matters; and

(F) to encourage fair wages and working conditions in the transportation industry;

. . . .

7. 49 U.S.C. § 10101a

In regulating the railroad industry, it is the policy of the United States Government—

(1) to allow, to the maximum extent possible, competition and the demand for services to establish reasonable rates for transportation by rail;

(2) to minimize the need for Federal regulatory control over the rail transportation system and to require fair and expeditious regulatory decisions when regulation is required;

(3) to promote a safe and efficient rail transportation system by allowing rail carriers to earn adequate revenues, as determined by the Interstate Commerce Commission;

(4) to ensure the development and continuation of a sound rail transportation system with effective competition among rail carriers and with other modes, to meet the needs of the public and the national defense;

(5) to foster sound economic conditions in transportation and to ensure effective competition and coordination between rail carriers and other modes;

(6) to maintain reasonable rates where there is an absence of effective competition and where rail rates provide revenues which exceed the amount necessary to maintain the rail system and to attract capital;

(7) to reduce regulatory barriers to entry into and exit from the industry;

(8) to operate transportation facilities and equipment without detriment to the public health and safety;

(9) to cooperate with the States on transportation matters to assure that intrastate regulatory jurisdiction is exercised in accordance with the standards established in this subtitle;

(10) to encourage honest and efficient management of railroads and, in particular, the elimination of noncompensatory rates for rail transportation;

(11) to require rail carriers, to the maximum extent practicable, to rely on individual rate increases, and to limit the use of increases of general applicability;

(12) to encourage fair wages and safe and suitable working conditions in the railroad industry;

(13) to prohibit predatory pricing and practices, to avoid undue concentrations of market power and to prohibit unlawful discrimination;

(14) to ensure the availability of accurate cost information in regulatory proceedings, while minimizing the burden on rail carriers of developing and maintaining the capability of providing such information; and

(15) to encourage and promote energy conservation.

addition to competition, belie the assertion that Congress intended the effect upon competition to outweigh all other factors combined.

The increased emphasis upon competition required by Congress modifies but does not basically alter the ICC's traditional approach, which has always considered the competitive impact of a proposed merger, but not to the exclusion of other factors. The antitrust laws do give "understandable content to the broad statutory concept of the public interest," *Federal Maritime Commission v. Aktiebolaget Svenska Amerika Linien*, 390 U.S. 238, 244, 88 S.Ct. 1005, 1009, 19 L.Ed.2d 1071 (1968), but the Supreme Court has held that, in deciding whether to approve a carrier consolidation

> the Commission must estimate the scope and appraise the effects of the curtailment of competition which will result from the proposed consolidation and consider them along with the advantages of improved service, safer operation, lower costs, etc., to determine whether the consolidation will assist in effectuating the over-all transportation policy. Resolving these considerations is a complex task which requires extensive facilities, expert judgment and considerable knowledge of the transportation industry. Congress left that task to the Commission "to the end that the wisdom and experience of that Commission may be used not only in connection with this form of transportation, but in its coordination of all other forms." "The wisdom and experience of that commission," not of the courts, must determine whether the proposed consolidation is "consistent with the public interest."

*McLean Trucking Co. v. United States,* 321 U.S. 67, 87–88, 64 S.Ct. 370, 380–381, 88 L.Ed. 544 (1944) (citations omitted). In short, the Commission has never sat "as an antitrust court [to determine] compliance with the Clayton, Sherman, or related antitrust acts." 366 I.C.C. at 485, *citing United States v. ICC,* 396 U.S. 491, 514, 90 S.Ct. 708, 719, 24 L.Ed.2d 700 (1970). Its statutory mandate is considerably broader. The ICC can disapprove mergers which would not violate the antitrust laws and can approve mergers even if they otherwise would violate the antitrust laws. *United States v. ICC,* 396 U.S. at 513–14, 90 S.Ct. at 718–719. The Commission has acknowledged that section 10101a and the Staggers Act require it to "take even greater care to identify harmful competitive effects and to mitigate those effects where possible," 366 I.C.C. at 502, but its basic approach remains unchanged. The Commission has always, and should continue, to perform a balancing test which takes a myriad of factors—including competition—into consideration and weighs "the potential benefits to applicants and the public against the potential harm to the public." *Id.* at 486, *quoting* 49 C.F.R. § 1111.10(c) (1981).

Here, the Commission did just that. Basically, the ICC balanced the admittedly serious anticompetitive effects of the proposed merger against the benefits anticipated to the public and concluded that, subject to certain conditions, this merger is consistent with the public interest. It is a truism that we owe the Commission substantial deference in reviewing its decisions. *Illinois Central R.R. v. Norfolk & Western Ry.,* 385 U.S. 57, 69, 87 S.Ct. 255, 262, 17 L.Ed.2d 162 (1966) (in reviewing Commission consolidation decisions, courts are limited to determining whether the Commission's conclusions are reasonably drawn from the evidence and findings in the case); *Florida East Coast Ry. v. United States,* 259 F.Supp. 993, 1002 (M.D.Fla. 1966), *aff'd,* 386 U.S. 544, 87 S.Ct. 1299, 18 L.Ed.2d 285 (1967) (three-judge district court) (A court's "task is at an end when [the court is satisfied] that the Commission has made adequate findings supported by substantial evidence, that it has perceived the danger areas, and judging by the statutory standards has concluded that the public interest is best served by allowing the merger.").

Given this standard of review, it is clear that the Commission's decision here must be upheld. A review of the Commis-

sion's opinion reveals that it did not ignore the importance of competition in considering whether to approve the proposed consolidation. *See, e.g., UPC-Control*, 366 I.C.C. at 501–33. On the contrary, the Commission expressly stated that "[t]he competitive impact of a consolidation proposal is a major factor in our consideration of the public interest." *Id.* at 501. The Commission was "cognizant of the increased importance of [its] competitive analysis," *id.* at 502, and took "substantial guidance" from the antitrust laws but held that, ultimately, its "primary inquiry is conducted under the terms of the Interstate Commerce Act." *Id.* at 503. The Commission's opinion exhaustively reviews the competitive effects of the proposed merger. *Id.* at 501–33. Its survey of both the parallel and end-to-end effects (roughly analogous to horizontal and vertical effects, respectively, *see id.* at 505) in the relevant geographic markets and submarkets led it to conclude that

> [t]he proposed transactions will have a significant adverse competitive effect (1) on rail transportation of transcontinental traffic, especially in the central corridor; and (2) on rail transportation in the Midwest, especially traffic moving through the corridor between Omaha/Council Bluffs and destined to the Gulf.

*Id.* at 533. The Commission found no "significant adverse competitive effects in any other area which arise from the consolidations." *Id.* Because the Commission believed that the negative effects could be ameliorated, it approved the proposed merger.

Petitioners are not satisfied with this. They object to the ICC's failure to base its decisions on a post-merger "market share analysis." *See, e.g.,* Brief of Petitioner ATSF at 21–30. Had such an analysis been conducted, petitioners maintain, the mammoth market share acquired by intervenor UP in the central corridor route would have

compelled the Commission to disapprove of the proposed merger. There are at least two problems with this argument. First, as noted above, the Commission is not limited to a consideration of only the competitive impact of the merger. If the Commission believes that a proposed merger will substantially benefit the public, it can approve that merger even if those benefits are unrelated to competition. Petitioners' argument here is simply a repetition of their contention, which we have already rejected, that a showing of the likelihood of anticompetitive consequences sweeps the board. Second, the traditional market-share analysis may not be mechanically applied in this context. The market shares in the rail industry, both before and after the merger, are "extremely high by conventional antitrust standards." 366 I.C.C. at 512. But merely adding the pre-market shares of the merging railroads would not necessarily have told the Commission anything definitive. One of the conditions the Commission imposed on this merger created a wholly new competitor in the central corridor, the SP/DRGW route. The Commission sought to predict the economic viability of the new route based upon the known technical and business characteristics of its component railroads. In reviewing other mergers, the Commission has recognized that diversion projections are of limited utility because they presuppose a static market when experience has shown that the competitive response of competing carriers following Commission approval of a consolidation will dramatically alter a marketplace's dynamics. *Burlington Northern, Inc.—Control & Merger—St. Louis-San Francisco Ry.*, 360 I.C.C. 784, 962, *aff'd sub nom. Missouri-Kansas-Texas R.R. v. United States*, 632 F.2d 392, 406 (5th Cir.1980), *cert. denied*, 451 U.S. 1017, 101 S.Ct. 3004, 69 L.Ed.2d 388 (1981); *CSX Corp.—Control—Chessie & Seaboard Coast Line Industries, Inc.*, 363 I.C.C. 518, 631–32 (1980).[8] This is especially relevant

---

**8.** This competitive response is also at the heart of the Commission's decision to remove the so-called "Bieber" conditions it imposed on Burlington Northern ("BN") in *Great Northern Pa-*

*cific—Merger—Great Northern*, 331 I.C.C. 228, 281–82, 352–54 (1967), *aff'd sub nom. United States v. United States*, 296 F.Supp. 853 (D.D.C. 1968) (three-judge court), *aff'd sub nom. North-*

here, where the Commission has created an entirely new line through the transcontinental central corridor. *See, e.g.,* 366 I.C.C. at 515, 576–78 (explaining what will mitigate the anticompetitive effects of the merger with respect to SP and assessing the competitive capacity of DRGW). Under such circumstances, the arithmetic of today's market shares cannot control the Commission's inquiry.

#### (b) *The public benefits*

■ Next, petitioners attack the "benefit" side of the equation, arguing that the merger would not produce the benefits to the public that the Commission believes it would. The Commission found that

> [t]he proposed consolidation of UP–MP–WP will result in substantial public benefits. Shippers and the general public will benefit by the improved efficiency and reliability of single system service, as well as the efficiency related savings of $47 million annually. These savings are likely to result in rate decreases, defer-

rals of rate increases, and a more financially viable system.

366 I.C.C. at 501. This $47 million figure is the sum of net revenue gains of $7.9 million derived from intermodal (motor carrier to rail carrier) diversion; cost savings of $5 million from the consolidation of facilities leading to reduced equipment needs, lower car hire and car maintenance expenses, reduced labor force and lower terminal company charges; annual cost savings of $32 million due to improved equipment utilization; and savings of $1.5 million due to improved administrative coordination as a result of the consolidation of UP and WP mechanical and maintenance departments and because joint purchases will permit volume discounts by equipment manufacturers.

Petitioners challenge these figures as being "wholly unreliable." Brief of Petitioners KCS at 25. According to KCS, the Commission's calculation of quantifiable public advantage was technically faulty and the actual present-value figure for public benefits (calculated before the costs of reduced competition are taken into account)

---

*ern Lines Merger Cases,* 396 U.S. 491, 90 S.Ct. 708, 24 L.Ed.2d 700 (1970). These traffic protective conditions help preserve the route between Bieber and Keddie, California by requiring BN to maintain rates over that route that are at least as favorable as those offered over alternative routes. *UPC-Control,* 366 I.C.C. at 592; Joint Brief for the ICC and the USA at 49 n. 27. They also require BN preferentially to solicit traffic for the Bieber route. *Id.* These conditions were originally imposed to cure specific competitive harms which the Commission believed would befall ATSF, WP and the shipping public if the Bieber route were allowed to deteriorate. 331 I.C.C. at 282–83.

The Commission removed the conditions for two reasons. First, "the justification for the Bieber conditions will no longer exist after consolidation," because WP will no longer be dependent upon interchanges with BN, SP or ATSF. 366 I.C.C. at 592. Second, the Commission believed that the proposed consolidation might harm competition in the West Coast north-south market. It was relying on the competitive response of other railroads, especially the BN, SP and DRGW, to offset the adverse competitive effects of the merger in this market. Therefore, the Commission was unwilling to "limit BN's competitive response to the new system" by "[c]ontinuing to require BN to hand off traffic to WP at Bieber." *Id.* When the

Bieber conditions were first imposed, the WP was "a small, neutral interline carrier, and 20 percent of its total freight revenues were obtained from Bieber traffic." *Id.* After the consolidation, the WP will not need the protection of these conditions. To that extent the Commission is correct that the justification for the conditions no longer exists. Moreover, ATSF's contention that there may be adverse competitive effects which the Commission failed to consider is based on a premise that is by no means inevitable—that BN will downgrade the Bieber route. Brief of Petitioner ATSF at 61. The Commission expressly found that "UP will have an economic incentive for continued participation in movements over WP's Bieber route." 366 I.C.C. at 527. As such, BN will continue to route traffic over WP's Bieber route (and eventually to ATSF), so long as it is economically prudent for it to do so.

It is the ICC's intention that "economic conditions and competition ... dictate appropriate routes" after the merger. 366 I.C.C. at 528. Removal of the Bieber conditions helps to ensure that "BN, SP and DRGW are positioned to compete for traffic which otherwise would go to the new UP system." *Id.* at 592. Given the importance of the competitive response of other railroads to the Commission's approval of this merger, we uphold the Commission's decision to lift the Bieber conditions.

would be, at most, $11.9 million. *Id.* at 36. Taking into account uncorrected anticompetitive effects, KCS maintains, the annual net cost to the public of the proposed merger is at least $7.1 million per year. *Id.* at 38.

A review of the Cost and Benefit Analysis in Appendix II to the Commission's opinion convinces us that we should accept the Commission's figures. A decision as which of two costing methodologies to adopt is precisely the kind of judgment which agencies, not courts, ought to make. The Commission satisfied itself that the methodology employed was acceptable. For example, here the Commission accepted, and indeed commended, the applicants' approach as making "achievable" "a figure for both the annual net benefits and combined annual net benefits plus one-time benefits." 366 I.C.C. at 776. The Commission was not, however, uncritical; it did not accept applicants' approach wholesale. Thus, when the applicants sought to equate the return on value of equipment saved with the value (replacement cost) for equipment required, the Commission demurred and adjusted the claimed saving downward. *Id.* at 777. Moreover, the Commission recognized that the cost-benefit analyses attempted necessarily required that certain estimates and assumptions be made. *Id.* at 776. We do not mean to focus attention on any particular item in the calculation but only to illustrate the sort of task that KCS would have us undertake. Were we to attempt a review so detailed and searching, we would be duplicating the extensive work of the Commission and doing so without its resources or expertise. That is not, and cannot be, the function of a reviewing court. We are not free to consider whether this consolidation satisfies our own conception of the public interest—that is the Commission's job. *Penn Central Merger Cases,* 389 U.S. 486, 498–99, 88 S.Ct. 602,

608–09, 19 L.Ed.2d 723 (1968); *Brotherhood of Maintenance of Way Employees v. United States,* 221 F.Supp. 19, 30 (E.D. Mich.), *aff'd,* 375 U.S. 216, 84 S.Ct. 341, 11 L.Ed.2d 270 (1963). The record clearly shows that the ICC exercised its independent judgment and expertise with respect to the calculation of public benefits. That must be enough for us, particularly in such a fact-bound and technical area.[9]

#### (c) *The conditions imposed*

Petitioners also challenge the conditions imposed by the ICC on the merger. The Commission did find that this merger, without certain ameliorative conditions, would have significant adverse impact on competition. 366 I.C.C. at 517, 533. Therefore, the Commission granted DRGW trackage rights over the merged system from Kansas City to Pueblo, Colorado and SP rights between St. Louis and Kansas City. The effect of this extensive grant was to create a new central corridor route from St. Louis to the West, with SP at either end and DRGW in the middle. The Commission concluded that this new route would "provide an effective competitive alternative to the UP system in the central corridor." *Id.* at 577. This finding was based on the Commission's assessment of the strategic location of the SP and DRGW lines and those railroads' operational capabilities. *See, e.g., id.* at 515 (western end of SP more extensive and efficient than WP). Also, the Commission carefully tailored the trackage rights to match anticompetitive effects. *See, e.g., id.* at 515–16 (importance to DRGW of loss of neutral Pueblo-Kansas City carrier). We noted above that in analyzing the response of a dynamic market, the Commission was entitled to engage in such operational scrutiny without presenting quite possibly irrelevant market-share figures. Plainly, this issue involved the kind of "judgmental or predictive" conclu-

---

**9.** In this appeal the Commission also emphasizes the significance of non-quantifiable public benefits. This troubles petitioners because a reviewing court is forced to defer substantially to the Commission in assessing such a finding. This may be true, but it is not particularly germane to this case; the non-quantifiable benefits on which the Commission relies, for example, the increased flexibility of a single system's integrated management, are sufficiently obvious to assure us that the Commission's decision here rests on firm ground.

sion with respect to which judicial deference to agency expertise is especially appropriate. *FCC v. National Citizens Committee for Broadcasting*, 436 U.S. 775, 813–14, 98 S.Ct. 2096, 2121–22, 56 L.Ed.2d 697 (1978). In fact, our scope of review of the Commission's decisions as to protective conditions is even more narrow than our scrutiny of its public interest determination. *See supra* p. 720. The Commission has extraordinarily broad discretion to impose protective conditions, 49 U.S.C. § 11344(c), and courts have appropriately given the Commission's selection of such conditions great deference. *Seaboard Coast Line R.R. v. United States*, 599 F.2d 650, 652 (5th Cir.1979); *Florida East Coast Ry. v. United States*, 259 F.Supp. 993, 1001·(M.D.Fla.1966), *aff'd*, 386 U.S. 544, 87 S.Ct. 1299, 18 L.Ed.2d 285 (1967).

While the Commission accorded SP and DRGW extensive trackage rights over the merged line, it did not set the terms under which UP would be paid for the use of its track. Rather, the Commission instructed the parties to seek to negotiate agreeable compensation terms accord-

ing to general criteria outlined in the decision, subject to the ICC's power to fix terms in the absence of an agreement. 366 I.C.C. at 589–90. This procedure was entirely rational, in that the ICC specifically provided that the terms, whether agreed to or imposed, must be such as to make the new transcontinental corridor (SP/DRGW) · competitive with the merged system. *Id.* at 590. Southern Pacific's argument that absent fixed terms it is impossible to tell whether the SP–DRGW route will be competitive is thus upside-down; we trust the Commission to ensure that the compensation terms will not defeat the purpose of the trackage rights. The ICC has in fact guaranteed that it will see to the proper functioning of the trackage rights. *Id. See Baltimore & Ohio R.R. v. United States*, 386 U.S. 372, 389, 87 S.Ct. 1100, 1108, 18 L.Ed.2d 159 (1967) (ICC faulted for failing to provide protection it thought necessary). Nor was there anything cryptic about the Commission's decision on this point, as DRGW suggests, we sustain the ICC's decision on trackage rights compensation terms.[10]

**10.** Petitioner SP also contends that the ICC's approval of this merger violates the Pacific Railroad Acts. Act of July 1, 1862, ch. 120, 12 Stat. 489; Act of July 2, 1864, ch. 216, 13 Stat. 356, *codified at* 45 U.S.C. § 83 (1982). We disagree. In approving a consolidation such as this one, the ICC has the express authority to "exempt [a carrier] from the antitrust laws and from *all other law,* including State and municipal law, as necessary to let that person carry out the transaction ...." 49 U.S.C. § 11341(a) (Supp. V 1981) (emphasis added). The Supreme Court long ago expressly rejected SP's argument that the ICC's exemption authority is limited to antitrust and similar restraining and prohibitory laws. *Texas v. United States,* 292 U.S. 522, 534, 54 S.Ct. 819, 825, 78 L.Ed. 1402 (1934). The ICC need only consider the policies expressed in those Acts in determining whether the consolidation is in the public interest. *See Northern Lines Merger Cases,* 396 U.S. at 511–13, 90 S.Ct. at 717–19. We are satisfied that the Commission adequately considered the Pacific Railroad Acts' policies. 366 I.C.C. at 548–62.

The Commission held, first, that the proposed merger did not violate the statutory requirement that "the whole line of said railroad shall be operated and used for all purposes ... as one connected continuous line." 45 U.S.C. § 83. Southern Pacific's contention is that the Acts

"required much more than a mere physically continuous railroad." Brief for Petitioners SP at 65. The Supreme Court has made clear that this part of the Act was intended to secure the permanent physical connection of a transcontinental route and the conduct of through operations over it. *See Union Pacific R.R. v. Hall,* 91 U.S. 343, 353–54, 23 L.Ed. 428 (1876). *See also United States v. Union Pacific R.R.,* 226 U.S. 61, 91–92, 33 S.Ct. 53, 59–60, 57 L.Ed. 124 (1912); *Southern Pacific Co. v. United States,* 277 F.Supp. 671, 679 (D.Neb.1967). After the consolidation, UP will continue to interchange traffic with SP at the Utah gateway, thus ensuring that SP and UP are still part of "one continuous line" of transcontinental traffic. Also, we agree with the Commission that "the fundamental purpose of the 'one continuous line' provision will ... be satisfied by the existence of several other alternative transcontinental routes ...." 366 I.C.C. at 552. Second, the Commission rejected SP's contention that the Pacific Railroad Acts granted to it certain unspecified "vested rights" that are violated by the merger. Southern Pacific's claim is specious. The Acts create contract rights between the party railroads and the federal government, not between the party railroads themselves. The Commission's action does not impair any rights SP has with respect

722

### 2. The Commission's Denial of Trackage Rights to KCS

Petitioner KCS challenges the Commission's denial of its application for trackage rights on MPC lines to expand KCS's service within eastern Texas and Louisiana. The theory of KCS's application is that the public interest in effective rail competition requires the imposition of this condition upon the consolidation. KCS claims that, absent the grant of the trackage rights it requests, the public will never have effective rail competition in these markets.

■ The conditions KCS proposed were concededly unrelated to the consolidation at issue. They were not designed to mitigate any anti-competitive consequences stemming directly from the consolidation. Rather, KCS's proposed conditions represent its vision of what effective rail competition in eastern Texas and Louisiana requires irrespective of the consolidation.

The Commission properly denied KCS's request. *See UPC-Control,* 366 I.C.C. at 562–65. The Commission's criteria regarding the imposition of conditions clearly establish that conditions are not to be used to address problems unrelated to a merger or consolidation. *See, e.g., Burlington Northern, Inc.—Control & Merger—St. Louis-San Francisco Ry.,* 360 I.C.C. at 952 ("conditions on a merger are not to be used to ameliorate longstanding problems which were not created by the merger"); *Railroad Consolidation Procedures,* 366 I.C.C. at 92. This position, strongly supported by both the Department of Justice and the Department of Transportation, reasonably effectuates the Commission's statutory mandate. As the Commission noted, "[i]mposing conditions unrelated to a merger's impact, upon a transaction otherwise

consistent with the public interest, would be at odds with the Congressional policy that privately-initiated transactions should be approved so long as they are consistent with the public interest." *UPC-Control,* 366 I.C.C. at 564. Once the Commission determined that the conditions imposed upon the consolidation had rendered that consolidation consistent with the public interest, it was under no compulsion further to reform the proposed consolidation. KCS sought to use the proposed consolidation as a springboard from which to launch a request for conditions having no connection with that consolidation. But the Commission is not required to act as a roving ombudsman restructuring railroads on its own in order to satisfy an individual carrier's notion of what effective competition may require.

### 3. The Commission's Jurisdiction over ATSF's Track

The MPC lines over which the Commission granted SP and DRGW trackage rights involve two segments of track, one eight miles long and the other twelve, owned by ATSF. ATSF challenges the Commission's decision to award SP and DRGW rights over its track on three grounds: 1) the Commission lacks jurisdiction under 49 U.S.C. § 11103(a) to make such an award; 2) even if jurisdiction exists, the Commission violated 49 U.S.C. § 11103(a) by allowing SP and DRGW to use ATSF's track before compensation had been "paid or adequately secured"; and 3) the interim agreement between UPC and DRGW allowing DRGW to move its cars in MPC's trains along a segment of ATSF's track is illegal because it is a pooling arrangement and was not approved under 49

---

to the federal government. *See Burke v. Southern Pacific R.R.,* 234 U.S. 669, 680, 34 S.Ct. 907, 911, 58 L.Ed. 1527 (1914); *United States v. Union Pacific R.R.,* 98 U.S. 569, 613–14, 25 L.Ed. 143 (1878).

The Commission concedes that SP's final claim—that the approval merger violates the nondiscrimination provision of the Pacific Railroad Acts—has merit, but it held that it was not barred from "immuniz[ing] the carriers from operation of the nondiscrimination provisions

where, as here, we have found that the UP/WP consolidation is in the public interest." 366 I.C.C. at 553. Although the ICC's explanation is not entirely clear, we read its opinion to mean that, in the Commission's view, the other benefits of this merger outweigh the harmful effects of discrimination which the Pacific Railroad Acts seek to avoid. Since, as noted above, the Commission's determination of the public interest is entitled to deference, *see supra* p. 720, we uphold the Commission's decision.

U.S.C. § 11342 (Supp. V 1981). We have fully considered ATSF's arguments and conclude that the Commission's decision to grant SP and DRGW rights over ATSF's track was not improper.

Under 49 U.S.C. § 11103(a), the Commission has the authority to order one carrier to allow another carrier to use its "terminal facilities, including main-line tracks for a reasonable distance outside of a terminal" if the use is "practicable and in the public interest." ATSF argues that the term "terminal facilities" is limited in meaning to trackage that is within the operating limits of the terminal area and that is used for terminal purposes. It contends that SP and DRGW will use the segments for through service only and that the segments are not within the operating limits of the Kansas City or Pueblo terminals. In addition, ATSF claims that the Commission did not limit its consideration of the "public interest" to an examination of the improvements in rail service in the relevant terminal area.

■ The Commission has long held that the "terminal facilities" should be broadly construed because the purpose of the section is highly remedial. *See, e.g., CSX Corp.—Control—Chessie System, Inc. & Seaboard Coast Line Industries, Inc.*, 363 I.C.C. at 585; *City of Milwaukee v. Chicago & N.W. Ry.*, 283 I.C.C. 311, 314 (1951). The purpose of this section is to avoid "unnecessarily duplicated" lines, and it is not necessarily limited to benefiting the rail service in the relevant terminal area. *See Spokane, Portland & Seattle Ry.*, 348 I.C.C. 109, 142–43 (1975). Here, the Commission held that the use of ATSF's track was necessary to allow SP and DRGW to enter the Kansas City and Pueblo terminals and that the use was practicable and in the public interest because it allowed the Commission to create a competitive alternative in the central corridor to the new UPC system. *See UPC-Control*, 366 I.C.C. at 573–78 (DRGW-Pueblo), 586–89 (SP-Kansas City). This determination is consistent with Commission precedent. In *Chicago & Alton R.R. v. T.P. & W. Ry.*, 146 I.C.C. 171,

179 (1928), and *Spokane, Portland & Seattle Ry.*, 348 I.C.C. at 142–43, the Commission granted one carrier the right to move over twelve and six-and-three-quarter mile segments of another carrier's line. In both those cases, the Commission granted the rights so that the carriers might "bridge the gap" between their line and the terminal. It did not require in either case that the segments be used for terminal purposes.

The Commission has never held 49 U.S.C. § 11103(a) or its predecessor to require that the term "terminal facilities" be limited to the trackage within the operating limits of the terminal. In any event, the segment near the Pueblo terminal is actually within that terminal's limits, *UPC-Control*, 366 I.C.C. at 574, and the segment near the Kansas City terminal is halfway within that terminal's limits. *Id.* at 587–88. We hold, therefore, that the Commission has the jurisdiction to make the trackage rights awards.

■ Under 49 U.S.C. § 11103(a) there is an additional requirement that the compensation for use of the "terminal facilities" must be "paid or adequately secured" before the use can commence. ATSF argues that this condition was not met because the trackage rights were made immediately effective and no agreement as to compensation was made. It is true that the Commission directed the parties to negotiate the terms of compensation among themselves, *UPC-Control*, 366 I.C.C. at 589–90, and that no agreement was reached prior to the commencement of the transaction. Nonetheless, the Commission did indicate that if the parties failed to agree it would "apply the principles for compensation in condemnation proceedings." *Id.* at 576 n. 114. We hold that the Commission is bound by this statement and that it fulfills the requirement of the term "adequately secured" under 49 U.S.C. § 11103(a). We find it appropriate to note at this time that, because the use of ATSF's track was adequately secured, ATSF has suffered no injury under the Interstate Commerce Act and that its arguments are more directed

at derailing the merger rather than protecting its rights.

ATSF's final argument is that the interim agreement between UPC and DRGW allowing DRGW to move its cars in MPC's trains along a segment of ATSF's track is illegal because it is a pooling arrangement and was not approved under 49 U.S.C. § 11342. This argument has been fully considered and rejected by the Commission. *See* Joint Appendix at 357–62, 365–70. In any event, ATSF's claim is now moot because the interim agreement is no longer in effect.

### 4. *DRGW's Request for Independent Ratemaking Authority*

 In addition to trackage rights, DRGW requested that the Commission approve a condition for independent ratemaking authority ("IRA") over the WP portion of the merged system. This IRA, set out in Appendix D–2 of the Commission's opinion, would have required WP to accede to rates set by DRGW.[11] It would have provided the merged system's automatic concurrence to any rate the DRGW wished to set in conjunction with WP routings in competition with the merged system. The IRA would therefore have allowed DRGW to quote its own rates from Kansas City to Northern California while, because of its trackage rights on the UP system, providing service between Utah and Kansas City. DRGW contends that the IRA was "designed to offset the merged system's domination of Utah junction traffic and provide what would be, in effect, independent competition to the monopolistic control exerted by UP in the central corridor." Brief for Petitioner DRGW at 20. By allowing the DRGW to offer competitive rates for shipments passing through the Utah junctions without advance WP concurrence, "the previous competitive rate environment at Utah junctions" would be preserved because DRGW could offer "an independent alternative to the UP in the central corridor."

*Id.* at 21. Basically, DRGW fears that without this IRA it will be foreclosed from participating in California traffic because UP will favor WP while SP will shift to its long haul southern routes. Alternately, DRGW fears that SP will arrive at a collusive accommodation with UP in Utah to share California traffic. The Commission found that granting DRGW the rate making authority would enable it to attract California traffic itself, thus reducing DRGW's incentive to work with SP, its western interchange partner. This would weaken the new SP/DRGW line, which the Commission was relying on to provide competition in the central corridor. 366 I.C.C. at 578–79.

This reasoning does not satisfy our central concerns. Granting the IRA would have an effect that the Commission's opinion simply does not address—namely, it would create a third transcontinental route over SP from St. Louis to Kansas City, DRGW from Kansas City to Utah and from Utah to Northern California on the WP. Assuming that WP's lines provide a strong route to California, this third route would seem to be a good alternative to the merged system. If the WP lines are inadequate to serve the Utah-Northern California traffic, SP's competing line (the gathering area of which impressed the ICC) would be a sufficiently viable and strong competitor with WP to force DRGW to deal with SP. Moreover, given SP's southern corridor, which is certainly capable of handling transcontinental traffic, DRGW may need the "leverage" afforded by an independent route to the West Coast in order to induce SP participation in the central corridor route.

In short, if WP's lines are good enough to serve California, the Commission has not adequately explained why the IRA should not be granted to create a third transcontinental central route. If, on the other hand, the WP lines are not good enough to create such a route, the Commission's theory—

---

**11.** The UP system, however, would be guaranteed revenue calculated on the basis of WP divisions of revenue according to the higher of the UP or DRGW formulas as of the date the merger proposal was submitted to the Commission.

that DRGW would have a reduced incentive to deal with SP—is undercut by the competitive advantage SP's lines have over those of WP. Given these unanswered questions, we remand the decision as to the requested IRA to the ICC for further consideration and explanation.

### 5. *The Labor Issues*

Petitioners ATDA and BMWE challenge the Commission's denial of their requests that the *New York Dock* conditions imposed on the applicant carriers be extended to protect the interests of the employees of non-applicant carriers. ATDA also challenges the Commission's refusal to impose two specific conditions over and above those outlined in *New York Dock*. These proposed conditions would require the Commission to approve, after notice and opportunity for a hearing, any changes in the form of UPC's corporate control over MPC and WP and any transfer of MPC or WP train dispatching work or train dispatchers. We have fully considered petitioners' arguments and conclude that the Commission properly denied their requests.

Petitioners' first argument—that 49 U.S.C. §§ 11344(b)(1)(D) and 11347 require the Commission to protect the interests of all affected railroad employees—has been recently considered and rejected by this court. *See Lamoille Valley R.R. v. ICC*, 711 F.2d 295, 323–24 (D.C.Cir.1983). We see no need at this point to add to the thorough discussion of that opinion nor do we find any different result warranted.

 The Commission's refusal to impose the two specific conditions also was proper. First, ATDA is concerned that, unless the Commission were to require notice and opportunity for a hearing prior to allowing a change in the form of UPC's corporate control over MPC and WP, the affected employees would not have an effective right to be heard with respect to protection above the minimum level outlined in *New York Dock* until after consummation of the transaction. *See* 49 C.F.R. § 1180.4(g) (1983). The Commission's power to allow changes in the corporate form

of a carrier is set out at 49 U.S.C. § 10505 (Supp. V 1981). That section allows the Commission to exempt a carrier's change in corporate form from many requirements of the Interstate Commerce Act, but it specifically forbids the Commission "to relieve a carrier of its obligation to protect the interests of employees as required by [the Interstate Commerce Act]." *Id.* § 10505(g)(2). Thus, regardless of whether the employees are entitled to complain before or after the transaction occurs, they are entitled to complain if the labor protective conditions imposed are not sufficient, making imposition of ATDA's first condition unnecessary.

 Second, ATDA is concerned that, unless the Commission were to require notice and opportunity for a hearing prior to allowing UPC to transfer WP and MPC train dispatching work or train dispatchers, the interests of the affected train dispatchers would not be adequately considered. The Commission concluded that, "in the event employees might be impacted in the future, . . . they will be afforded the protections [i.e., the *New York Dock* conditions] we imposed here." *UPC-Control*, 366 I.C.C. at 622. This conclusion is consistent with this court's decision in *American Train Dispatchers Association v. ICC*, 671 F.2d 580 (D.C.Cir.1982). Moreover, it is supported by the Commission's findings that there is no evidence in the record that transfers of work or dispatchers are contemplated and that requiring a hearing would be "unduly burdensome" and would "fetter applicants' operating capabilities." The Commission's refusal to impose this condition is not arbitrary or capricious.

### 6. *The Fairness of the Terms of the Consolidation*

 Petitioner Edward K. Wheeler, a minority shareholder of WP Class A common stock, objects to the finding of the Commission that the terms of the consolidation with respect to the interests of minority shareholders are "fair and reasonable" as required by the Act. *See* 49 U.S.C. § 11344; *Schwabacher v. United States*, 334 U.S. 182, 201, 68 S.Ct. 958, 968,

92 L.Ed. 1305 (1948) (the Commission "is under a duty to see that minority interests are protected, especially when there is an absence of arm's length bargaining or the terms of the merger have been imposed by management interests adverse to any class of stockholders"). He contends that the $20 per share purchase price offered by UPC to WP stockholders is unreasonably low because that price fails to reflect WP's industrial land holdings and, more importantly, fails to reflect the benefits that will accrue to UPC as a result of its consolidation with WP. Petitioner Wheeler does not ask that we set aside the Commission's approval of the consolidation. He only requests that we remand the question of the valuation of WP stock back to the Commission for further consideration. We conclude, however, that the Commission's methodology of valuation is reasonable and that its conclusions are supported by substantial evidence in the record.

First, contrary to Wheeler's principal complaint, the Commission explicitly took into account the enhanced value of WP stock as a result of the consolidation. *See UPC-Control*, 366 I.C.C. at 636–38. It calculated the difference in the market value of WP stock immediately prior to UPC's tender offer and the present value of the stock in light of the consolidation, describing that difference in value as "the merger premium." The Commission then allocated a variable share of the merger premium to WP shareholders, concluding that the resulting amounts added to the market value of the WP stock before the tender offer would yield a range of reasonable prices from $16.85 per share to $26.25 per share. Because the $20 per share to be paid by UPC under the terms of the consolidation falls within this range, the Commission found that price to be fair and reasonable.

Petitioner Wheeler attacks the Commission's conclusion on the ground that the studies relied upon by the WP management in accepting UPC's terms for consolidation

were flawed. Wheeler also contends that the Commission erred in finding that UPC's offer was the result of arm's length negotiations. These contentions, however, are unavailing. First, the Commission did not simply rely upon the judgments of WP's financial experts in determining the fairness of the consolidation terms, although it did consider those judgments. Rather, the Commission found that the $20 per share price for WP stock was fair on the basis of its own independent analysis. Second, there exists substantial record evidence to support the Commission's finding of arm's length negotiations between WP and UPC. WP was assisted in the negotiations by an independent investment banking firm, Solomon Brothers, which advised WP that $20 per share was a fair price for its stock.[12] Moreover, this price was approved by WP's Board of Directors in light of Solomon Brothers' advice.

Finally, petitioner Wheeler contends that the Commission unreasonably disregarded WP's industrial landholdings in determining the fairness of UPC's tender offer. But contrary to Wheeler's assertions, the Commission did not simply disregard WP's landholdings. Rather, it stated that such holdings are relatively unimportant in the context of the methodology the Commission used in determining a reasonable range of prices for WP's stock. Because WP is a going concern, the Commission determined that the value of its stock can best be measured by WP's earning power as reflected by performance in the stock market rather than the book value of the company. *Cf. Seaboard World Airlines, Inc. v. Tiger International, Inc.*, 600 F.2d 355, 361–62 (2d Cir.1979); *Mills v. Electric Auto-Lite Co.*, 552 F.2d 1239, 1247–49 (7th Cir.1977). Using the stock market as a guide in ascertaining value, $20 per share for WP's stock represented a 38 percent premium over the $14.50 WP's stock sold for the day before the public announcement of the tender offer. It is true that the Commission's discussion of this issue is

---

**12.** UPC did not seek outside advice with respect to the fairness of its offer to UPC stockholders. UPC claims that it did not obtain such advice

because of the relatively small size of the transaction. *See UPC–Control, supra* note 2, 366 ICC at 635.

unduly condensed. *See UPC–Control,* 366 I.C.C. at 636. Nonetheless, the Commission's approval of UPC's tender offer meets the deferential standards of review applicable in this context. "[A]lthough the Commission in fulfilling its statutory responsibilities is to carefully review all of the terms of a merger proposal and determine whether they are just and reasonable, it is not for the agency, much less the courts, to dictate the terms of the merger agreement once this standard has been met." *Northern Lines Merger Cases,* 396 U.S. at 520, 90 S.Ct. at 722.

Therefore, we affirm the decision of the Commission to approve this merger and remand the case for reconsideration of DRGW's request for independent ratemaking authority.

*So ordered.*